779 A.2d 1004

**Steven Joseph SCHMITT,**

v.

**STATE of Maryland.**

**No. 0104, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Aug. 31, 2001.

**6**

Mark Gitomer, Baltimore, for appellant.

Jason F. Trumpbour, Staff Attorney (J. Joseph Curran, Jr., Attorney General, Ann N. Bosse, Assistant Attorney General, Baltimore, and Sandra A. O'Connor, State's Attorney for Baltimore County, Towson, on the brief), for appellee.

Argued before MURPHY, C.J., and ROBERT L. KARWACKI and CHARLES E. MOYLAN, Jr. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge, Retired, Specially Assigned.

This is an appeal from the partial denial of post-conviction relief. In an August 1994 trial before a Baltimore County jury, the appellant, Steven Joseph Schmitt, was convicted of first-degree murder, attempted armed robbery, and the use of a handgun during the commission of a crime of violence. He is serving a term of life imprisonment. This Court on direct appeal affirmed the convictions in an unreported opinion, see *Schmitt v. State*, No. 1414, Sept. Term, 1994, 105 Md.App. 805 (June 15, 1995) (*Schmitt I*), and the Court of Appeals denied *certiorari.* 340 Md. 303, 666 A.2d 1237 (1995).

On February 1, 2000, Judge J. Norris Byrnes granted the appellant partial post conviction relief and permitted him to file a belated appeal on two issues. Those issues were whether the trial court erred (1) in denying the appellant the right to introduce an eyewitness statement, contained in a police report and made by a person who was unavailable for trial, indicating that someone other than the appellant committed the crime; and (2) in allowing a police detective to testify regarding the absence of any police records of a shooting at an automatic teller machine on Pulaski Highway between September 18, 1990, and October 1991, other than the shooting for which the appellant was tried. This Court in an unpublished opinion answered both of those questions in the negative and affirmed the appellant's convictions. *Schmitt v. State*, No. 3003, Sept. Term, 1999 (Oct. 19, 2000) (*Schmitt II*).

In his petition for post-conviction relief the appellant raised twenty-two separate allegations of ineffective assistance of trial counsel. Other than granting the belated appeal on two issues, Judge Byrnes denied all other relief requested by the appellant. It is the denial of four of those "other contentions" that is currently before us on appeal.

Two contentions claim that although Judge Byrnes found instances of deficient performance by trial counsel, he erroneously failed to find trial prejudice:

1. That Judge Byrnes erroneously determined that although counsel was ineffective for failing to object to the State's faulty proffer of James Gatch's testimony, such a failure was not so prejudicial as to warrant a new trial;

2. That Judge Byrnes erroneously determined that although trial counsel was ineffective for failing to request an alibi instruction, such failure was not so prejudicial as to warrant a new trial.

Two other contentions claim that Judge Byrnes erroneously failed to find two instances of deficient trial performance in the first instance:

3. That Judge Byrnes erroneously determined that trial counsel was not ineffective for failing either to move for a mistrial or to ask for a missing witness instruction in light of the State's failure to call Jerry Scharf as a witness;

4. That Judge Byrnes erroneously determined that trial counsel was not ineffective for failing to try to impeach State's witness Germaine Churma with her prior conviction of thefts.

The fifth is the "grab bag" contention:

5. That Judge Byrnes erroneously determined that the cumulative effect of all errors at trial did not result in a denial of the appellant's right to the effective assistance of counsel.

## THE *STRICKLAND V. WASHINGTON* STANDARDS

In our recent decision of *State v. Gross*, 134 Md.App. 528, 550, 760 A.2d 725 (2000), *cert. granted*, 362 Md. 623, 766 A.2d 147 (2001), we explained the applicable standard of review for claims of ineffective assistance of counsel:

> The fountainhead is *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). After pointing out that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," 466 U.S. at 686, 104 S.Ct. 2052, the Supreme Court went on to establish the now classic two-pronged test for making such a determination. It referred to the two distinct elements that had to be analyzed as the "performance component" and the "prejudice component" of the "ineffectiveness inquiry." 466 U.S. at 698, 104 S.Ct. 2052.

See especially the excellent analysis and summary of the *Strickland v. Washington* test by Judge Orth in *Harris v. State*, 303 Md. 685, 695–701, 496 A.2d 1074 (1985). And see Judge Hollander's comprehensive analysis in *State v. Jones*, 138 Md.App. 178, 204–09, 771 A.2d 407 (2001).

We will look at the "performance component" and at the "prejudice component" as we examine each of the appellant's claims of ineffective assistance of counsel.

### Failure of Defense Counsel to Object to
### State's Argument on Admissibility

The first issue raised on appeal concerns the characterization of the trial testimony of James Gatch made by the State and not objected to by defense counsel in the course of a legal argument at the bench. The murder had occurred at an ATM machine on Pulaski Highway, directly across the street from the Pilot Motel where the appellant was staying. Gatch had testified as a State's witness regarding a conversation he had had with the appellant in October of 1991, one year after the crime was committed. According to Gatch, during that con-

versation the appellant asked Gatch for a ride out of town due to the fact that the appellant was suspected of murder. The appellant, according to Gatch, admitted during that conversation that he had "shot someone at an automatic teller machine."

During the direct examination of Detective Brubaker, the lead detective on the case, the prosecutor asked him if he had checked police records for any reports of a robbery and shooting between September 19, 1990, and the fall of 1991. Defense counsel objected, and the State made the following proffer as to what Detective Brubaker would testify to:

> If you remember, *James Gatch testified* that he talked to the Defendant over a year after this incident occurred and *that the Defendant had told him that he robbed and shot a guy at the ATM on Pulaski Highway.* I want to be able to show that the Defendant, if you believe that statement, the Defendant wasn't referencing some other shooting and robbery on Pulaski Highway that he might have committed or that someone else might have committed because th[ere] weren't any other shooting[s] and robberies in that area. Both Baltimore City and Baltimore County Police reports where checked. The incident that happened on September 18, 1990, was the only shooting and robbery that occurred in that area.

(Emphasis supplied).

## A. There Was No Proffer of James Gatch's Testimony

Although the appellant raises a lot of flack about this issue, it is difficult to pinpoint precisely what his issue really is. As we attempt to analyze it, let it be very clear that we are going to take the issue as framed by the appellant's brief at face value. We are not going to frame an issue for him that he has not expressly framed for himself. As the appellant sets out this issue:

**THE POST CONVICTION COURT ERRED IN NOT GRANTING THE APPELLANT A NEW TRIAL AFTER IT DETERMINED THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN REGARD TO**

### THE STATE'S ERRONEOUS PROFFER OF JAMES GATCH'S TESTIMONY

(Emphasis supplied).

For starters, there was no State's proffer, let alone a "State's erroneous proffer, of James Gatch's testimony." James Gatch actually testified and there was, therefore, no occasion for anyone to proffer at any time what his testimony was going to be. His testimony was already a *fait accompli.*

During the testimony of Detective Brubaker the State asked him whether he had had "an occasion to check the Baltimore County and Baltimore City Police records for any incidents involving a robbery and shooting between September 19th of 1990 and the fall of 1991." There was a defense objection and counsel approached the bench. At that bench conference there was, to be sure, a *proffer* as to what Detective Brubaker's records check would show, but the proffer was of Detective Brubaker's likely future testimony and was not in any way a "proffer of James Gatch's testimony."

What the appellant was actually objecting to at the hearing on his post-conviction petition was not a proffer but, rather, the State's allegedly erroneous characterization, in the course of an argument at the bench, of the appellant's admission to Gatch as including the geographic detail "on Pulaski Highway."

### B. An *Arguendo* Consideration

As we will subsequently explain more fully under our sub-heading "An Alternative Holding," we conclude that a true mischaracterization of the appellant's admission to James Gatch never took place. Gatch's reference to Pulaski Highway as a part of the appellant's admission actually came into evidence. Because the briefs and the oral argument of both the appellant and the State, however, are based exclusively on the assumption that such a mischaracterization indeed took place, and because the findings and rulings of the post-conviction court were based on the same assumption, we will, purely for the sake of argument, tentatively make the same

assumption in order to determine whether the appellant would have suffered a denial of the effective assistance of counsel even under those assumed circumstances.

## C. Ineffective Assistance: The Post Conviction Ruling

The appellant now contends that the failure of defense counsel to correct the State's allegedly erroneous statement that James Gatch had testified that the appellant told him "that he robbed and shot a guy at the ATM on Pulaski Highway" constituted ineffective assistance of counsel. What is now claimed to have been erroneous was not a reference in the admission to an ATM but the reference to Pulaski Highway.

At the hearing on the petition for post-conviction relief, the appellant's trial counsel conceded, "I will make no excuses. I made a mistake." Judge Byrnes found, with regard to the "performance" prong of *Strickland,* that defense counsel had made a mistake. Nonetheless, Judge Byrnes ruled that that mistake did not, in the last analysis, so prejudice the defense that there was a reasonable possibility that the outcome of the case would have been different had it not been for counsel's mistake. In that regard, Judge Byrnes explained:

> In light of all the circumstances, counsel's entire performance viewed cumulatively was not deficient. When considered as an aggregate, these allegations do not constitute prejudice to Petitioner sufficient to merit relief. Although trial counsel's performance was far from perfect, his performance did not affect the outcome of the case.

## D. The Impact, If Any, Was On a Legal Ruling

We note at the outset that this alleged mischaracterization came in the course of a legal argument over the admissibility of evidence at a bench conference before the judge alone. The jury was not privy to the alleged mischaracterization. They had heard for themselves what James Gatch had actually testified to. The evidentiary ruling, moreover, did not expose

the jury to the State's characterization of James Gatch's testimony.

For the appellant, therefore, to attempt to aggregate that alleged mischaracterization at the bench with other possible misstatements in the course of closing argument, and to deploy them all under the banner of "repeated use of false and misstated evidence," is misleading in the extreme. The appellant would have us believe that the cumulative effect of "repeated" misstatements had a poisonous effect on the minds. of the jurors, but this key characterization of Gatch's testimony, central to the appellant's argument about prejudicial jury impact, was never heard by the jurors and had no direct effect on them whatsoever.

The possible consequences of counsel's failure to object to the State's alleged mischaracterization of the Gatch's testimony will have to be assessed, therefore, in the less histrionic terms of its possible effect upon a legal ruling on admissibility rather than on the impressionable minds of the jurors.

### E. What Precisely Is The Appellant Claiming?

This brings us to the contention as actually set forth by the appellant in his brief. Four pages of the brief are devoted to this contention. Three of those four pages consist simply of stating the applicable standards for assessing the effectiveness of counsel under *Strickland v. Washington* and its supporting state and federal case law. A single page is spent on the merits of the contention itself. Not a single word of that single page, however, is directed to the possible impact that the alleged mischaracterization had on the admissibility ruling, which is where the damage, if any, would have occurred.

The appellant's argument seems to be that Judge Byrnes was in error in fashioning relief as he did because the relief fashioned, a belated appeal on this issue, was foredoomed to be ineffective. Having found that trial counsel "should have objected to the prosecutor's misstatements," Judge Byrnes, the appellant maintains, was compelled to grant a new trial instead of granting a belated appeal.

As can be seen from this Court's decision in *Schmitt II, that amounted to granting the appellant no relief at all.* Indeed, Kafka himself would have been proud of the result—trial counsel renders ineffective assistance by failing to object to the State's erroneous proffer; post conviction court grants belated appeal to address the effect of trial counsel's error; appellate court affirms trial court based on trial counsel's failure to preserve the issue for review. The absolute absurdity of this circular reasoning would be laughable, were it not for the fact that we are dealing here not with a work of fiction, but rather with a real-life case.

(Emphasis supplied).

### F. A Belated Appeal As A Cure For Appellate Prejudice

■ Because of the way the appellant's argument unfolds, it is convenient for us on this subissue simply to assume, *arguendo,* that counsel was deficient in terms of trial performance. We will proceed immediately to a consideration of *Strickland v. Washington*'s prejudice prong, at least insofar as it involves possible appellate prejudice rather than possible trial prejudice.

Aside from mischaracterizing, by careful omission, what this Court actually said in *Schmitt II,* the appellant balks at acknowledging that possible prejudice under *Strickland v. Washington* can take many forms and that when the possibility of an erroneous legal ruling is the consequence of the deficient trial performance, the awarding of a new trial is not necessarily the appropriate relief. A trial lawyer's deficient performance may, of course, result in trial prejudice by having an adverse impact on the trial verdict itself. It may, on the other hand, result in appellate prejudice. *State v. Gross,* 134 Md.App. at 581–86, 760 A.2d 725. The failure to preserve an issue for appellate review is a classic example of *trial* error resulting in possible *appellate* prejudice.

This last is the type of prejudice that Judge Byrnes found, and he remedied it by granting a belated appeal on the issue:

Trial counsel did [not] object to the admissibility of Detective Brubaker's testimony regarding the "Pulaski Highway" shootings. It was a critical part of the State's case. On appeal, this issue should have been addressed. Petitioner should be allowed a belated appeal on this issue.

On that belated appeal, ironically, it became clear that the appellant's objection to Detective Brubaker's testifying about a records check was based on broad evidentiary principles, as a matter of law, and was not based on the flawed factual predicate of an erroneous reference to Pulaski Highway. This Court thus phrased the appellant's contention in *Schmitt II:*

Did the trial court err in allowing a police detective to testify regarding the absence of any police records of a shooting at an automatic teller machine on Pulaski Highway between September 18, 1990, and October 1991, other than the shooting for which appellant was tried?

As he began his legal analysis in *Schmitt II,* Judge Thieme elaborated on the precise nature of the contention:

Appellant next argues that the trial court erred when it allowed Detective Brubaker to testify, over defense objections, regarding the absence of any Baltimore City or Baltimore County Police records, other than those for the case *sub judice,* of shootings taking place at ATM machines on Pulaski Highway between September 18, 1990, and October 1991. In a sidebar argument at the bench, the State justified admission of this testimony under Maryland Rule 5–803(b)(10), which appellant now contends did not apply to this case.

The contention was not that the trial judge's ruling would have been otherwise but for the allegedly inaccurate characterization of the appellant's admission to Gatch as including a reference to Pulaski Highway.

The initial portion of this Court's analysis of the admissibility question concerned the fact that the appellant's trial was a "transition case" where the crime had occurred before but the trial came after the July 1, 1994 effective date of Maryland Rule 5–803(b)(10). We did hold that with respect to pre 1994 evidentiary law that the appellant had failed to preserve his

argument for appellate review. It was this non-preservation holding that the appellant made reference to in his description of the appellant's plight as Kafkaesque. What the appellant conveniently ignores, however, is that we did, in an alternative holding, go on to address the merits of the admissibility issue. On the merits, Judge Thieme wrote for this Court:

> *Even had appellant preserved his argument for appeal, it fails on the merits,* for the absence of records exception was not unknown in Maryland prior to 1994. In a 1908 action for bigamy, for example, the Court of Appeals upheld the trial court's refusal to admit a certificate, prepared by a city record keeper, stating that there existed no record in his office of the marriage between defendant and a certain person. *See Pontier v. State,* 107 Md. 384, 68 A. 1059 (1908). The Court reasoned that "a mere negative certificate of the kind offered in this case" was inadmissible to prove the absence of such records; however, "[o ]ral testi-mony under oath of a search made of public records and its results is sometimes admitted* to show the nonappearance thereon of certain entries or facts...." *Id.* at 392 [68 A. 1059] (emphasis added). *See also Street v. State,* 60 Md. App. 573, 578, 483 A.2d 1316 (1984) ("It is well established that 'a competent witness, who has investigated and is familiar with the contents of the entire mass [of records] may testify that certain entries in the corporate records do not exist.' ") (quoting *Summons v. State,* 156 Md. 382, 387, 144 A. 497 (1929)), *aff'd,* 307 Md. 262, 513 A.2d 870 (1986).

(Emphasis supplied).

With respect to the admissibility of Detective Brubaker's testimony, therefore, there clearly was no ultimate appellate prejudice. Counsel's initial failure to preserve the issue for appellate review was inconsequential because the appellant was not ultimately denied his appeal on the issue. He got it and he lost it.

## G. The Performance Prong Revisited

■ Judge Byrnes may have been a trifle hasty in ruling that defense counsel's trial performance was deficient. His

ultimate ruling that in the final analysis there was no trial prejudice, however, rendered his earlier ruling on the performance prong inconsequential. By the same token, defense counsel's falling on his sword on this issue may have been unduly self-abasing. Our prerogative to reach our own conclusion in this regard is clear. *Harris v. State,* 303 Md. 685, 697–98, 496 A.2d 1074 (1985); *Bowers v. State,* 320 Md. 416, 428–29, 578 A.2d 734 (1990); *State v. Jones,* 138 Md.App. 178, 209, 771 A.2d 407 (2001); *State v. Purvey,* 129 Md.App. 1, 10, 740 A.2d 54 (1999); *Cirincione v. State,* 119 Md.App. 471, 485, 705 A.2d 96 (1998).

When the question is the effect of the trial performance on the resolution of a legal issue, raised or unraised, merely falling asleep at the switch or failing to argue effectively is not, *ipso facto,* a deficient performance. If counsel would not have prevailed on the legal issue in any event, no matter how timely it was raised or how effectively it was argued, then the less than sterling effort would not under *Strickland v. Washington* have constituted a deficient performance.

What needs to be analyzed, therefore, is whether counsel's failure to object to the State's alleged mischaracterization of James Gatch's testimony actually had any adverse influence on the trial judge's ruling with respect to the admissibility of Detective Brubaker's testimony. We conclude that it did not. One reason it did not is that it had nothing to do with the basis for the trial judge's ruling.

At the bench conference following the objection to Detective Brubaker's being questioned about the records check, the presence or absence of any reference to Pulaski Highway in the appellant's admission to Gatch was clearly not a pivotal issue. The trial judge was initially going to sustain the objection because he thought that Detective Brubaker's testimony about his review of the records would violate the rule against hearsay. The State argued that the testimony was an exception to the Hearsay Rule. The trial judge demanded to know the nature of the exception. After a passing reference to the absence of an entry in a business record, the State

settled on the absence of a public record or entry pursuant to Maryland Rule 5-803(b)(10), which exempts from the hearsay ban the following:

> Absence of public record or entry. Unless the circumstances indicate a lack of trustworthiness, evidence in the form of testimony or a certification in accordance with Rule 5-902 that a diligent search has failed to disclose a record, report, statement, or data compilation made by a public agency, or an entry therein, when offered to prove the absence of such a record or entry or the nonoccurrence or nonexistence of a matter about which a record was regularly made and preserved by the public agency.

The trial judge then overruled the objection, provided that the State could lay the foundation required by the rule. In our opinion, the trial judge's ruling on admissibility would not have been different even if a fuller and arguably more accurate discussion had taken place with respect to the absence from the appellant's admission of a specific reference to Pulaski Highway. That was not a consideration of any significance to the trial judge's ruling.

To say that, in our judgment, a fuller and more accurate discussion **WOULD** not have altered the ruling the trial judge made, however, is not necessarily to say that a fuller and more accurate discussion **SHOULD** not have altered that ruling. That is a distinct aspect of the effect of the trial performance on any evidentiary ruling.

As we turn to that aspect, we note that with respect to evidentiary rulings on admissibility generally and rulings with respect to relevance specifically, the trial judge is vested with wide, wide discretion. At issue here was the admissibility of Detective Brubaker's records check, which revealed no reports of an ATM robbery in the Pulaski Highway area for a period of one year following the September 18, 1990 shooting with which the appellant was charged.

We cannot say that if the reference to Pulaski Highway had been omitted from the factual predicate, the records check would have been so utterly bereft of relevance as to have

rendered the trial judge's evidentiary ruling to admit it an abuse of discretion. If the appellant was poised to argue that his admission to robbing and shooting someone at an ATM machine could have referred not to the shooting of Jerry Mathis on September 18, 1990 but to the shooting of some other victim at some other ATM machine, the absence of a report of such a crime even for a limited period and even for the limited immediate geographic area would have had some relevance in partially foreclosing such a strained and desperate argument. Under the circumstances, we conclude that the trial performance was not deficient in this regard.

## H. The Prejudice Prong At The Trial Level

■ Even if we were to assume, purely for the sake of argument, that trial counsel's performance had been deficient in that regard, there remains the separate issue of ultimate trial prejudice. The appellant would have us believe that Judge Byrnes actually decided the issue of trial prejudice in his favor and then failed to fashion the appropriate relief. Judge Byrnes did no such thing.

The appellant hangs too desperately on every hurried and passing word. After ruling that trial counsel "should have objected to the prosecutor's misstatements," Judge Byrnes did add that "[h]is failure to object could have affected the outcome of the case, *and it is addressed below.*" (Emphasis supplied). Whatever words he there spoke, Judge Byrnes nonetheless deferred for another eight pages any ruling on trial prejudice. He waited, as he should have, until he had ruled on all alleged deficiencies in trial performance and then "addressed below" the cumulative prejudicial effect of all of the performance deficiencies he had found. His ruling with respect to trial prejudice was clear:

> In light of all the circumstances, counsel's entire performance viewed cumulatively was not deficient. When considered as an aggregate, these allegations do not constitute prejudice to Petitioner sufficient to merit relief. Although trial counsel's performance was far from perfect, his performance did not affect the outcome of the case.

■ *Strickland v. Washington* was similarly clear that it is the totality of circumstances or cumulative effect of all errors that must be assessed in ruling on ultimate trial prejudice.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

466 U.S. at 695–96, 104 S.Ct. 2052.

Judge William Adkins wrote to a similar effect in *Bowers v. State,* 320 Md. 416, 436–37, 578 A.2d 734 (1990):

The post-conviction judge thought otherwise, but his approach was to consider each charge of deficient performance and consequent prejudice, and to decide that no one charge alone was serious enough to meet both *Strickland* tests. That approach was incorrect. . . .

Even when individual errors may not be sufficient to cross the threshold, their cumulative effect may be. . . .

We hold that the cumulative effect of Reddick's actions and non-actions was enough to establish that his representation of Bowers did not meet constitutional muster.

Judge Thieme said it for this Court in *Cirincione v. State,* 119 Md.App. at 506, 705 A.2d 96:

Even when no single aspect of the representation falls below the minimum standards required under the Sixth

Amendment, the cumulative effect of counsel's entire performance may still result in a denial of effective assistance.

The case against the appellant was a powerful one. Jerry Mathis was robbed and murdered at an ATM machine at between 1:54 and 1:59 A.M. The motel where the appellant was staying was immediately across the street. The front desk clerk described the appellant as pacing back and forth on the sidewalk in front of the motel beginning at about 1:30 A.M. He was "shaky and nervous" and smoking one cigarette after another. At what she estimated as between 1:45 and 1:50 A.M., the appellant rushed into the lobby from outside and asked her if she had heard gunshots. She had not. He then blurted out something about "ow[ing] somebody some money" and thinking "maybe he would get killed if he didn't give them the money he owed them."

When Officer David Hartman arrived at the crime scene at 1:59 A.M., the victim was still alive, slumped across the front seat of his car and covered with blood and broken glass. He had one gunshot wound to the head and two to the left side of his back and chest. He described his assailant as 1) a white male, 2) in his early 30's, 3) with light brown hair, 4) wearing blue jeans, and 5) wearing a white tee-shirt. Officer Susan Markowski; Priscilla Jones, the front desk clerk; and Germaine Churma collectively described the appellant that night as 1) a white male, 2) in his 30's, 3) with light brown hair, 4) wearing blue jeans, and 5) wearing a white tee-shirt. The desk clerk, moreover, testified that he was the only person she had seen at the motel that night who fit that description.

When Officer Markowski arrived at the parking lot of the motel at about 2:20 A.M., the appellant, who had been standing in a phone booth, approached her and asked 1) what had happened at the bank and 2) had someone been robbed at the ATM. When asked by the officer where he had been, he stated that he had just returned to the motel from "the Block." That statement was inconsistent with the testimony of the witnesses who placed him at the motel as much as one hour earlier. He never mentioned having heard gunshots.

Genevieve Churma testified that she had been at the motel in a room with the appellant and another man since before 1:30 A.M. She testified that both men left the room at approximately 1:30 A.M. She testified that shortly thereafter she heard gunshots and saw flashing lights. When the two men, one of whom was the appellant, subsequently returned to the room, she told them about the gunshots and "they just laughed."

Combined with all of those circumstances, the admission the appellant made to James Gatch produced an overwhelming case of guilt. The admission was made in October 1991 at the Midway Bar. Gatch was a tractor-trailer driver who frequently traveled out of state. The appellant wanted to know if Gatch "would be interested in taking him out of town." When Gatch replied that he was going to remain at home for a while, the appellant offered Gatch an unspecified amount of money, which the appellant actually removed from his pocket. Gatch declined the offer.

The appellant informed Gatch that he believed that the police "had reasons to suspect him for murder." The appellant then admitted that "he shot someone at a bank teller machine" and that "he had to leave the state because he was being charged with a murder." The murder with which the appellant was subsequently charged was that of Jerry Mathis on September 18, 1990.

That admission made by the appellant was just as damning, whether it made specific reference to Pulaski Highway or not. Unless the appellant was a serial killer with half a dozen ATM murders to his credit, any further pinpointing of the admitted "shooting at an ATM machine" was superfluous. What was of overwhelming significance was the appellant's acknowledgment that he had shot and killed someone at an automatic teller machine and had to leave town. The suggestion that without the reference to Pulaski Highway the jury might have concluded that the admission was referring to some other robbery-murder at some other automatic teller machine is absurd.

We conclude that even if the records check had not been introduced into evidence, the case against the appellant was so overwhelming that there was no reasonable possibility that the verdict would have been different.

## AN ALTERNATIVE HOLDING

### A. The Inculpatory Reference Was In Evidence

There is a separate and totally independent reason for rejecting the appellant's first contention. The contention rests on a predicate that is factually flawed. There was most assuredly evidence in the case that the appellant's admission to James Gatch, indeed, included a reference to Pulaski Highway. During defense counsel's cross-examination of Detective Brubaker, minutes after the ruling on admissibility, the following exchange took place:

> Q: Now, when you interviewed Mr. Gatch on November 19th, 1991, Mr. Gatch didn't tell you that [Schmitt] said anything about an ATM machine, did he? *All he said to you was we robbed someone on Pulaski Highway* and he had to shoot someone, we don't know if he was okay?
>
> A: That's correct.

(Emphasis supplied).

### B. Hearsay, Albeit Objectionable, May Nonetheless Be Good Evidence

 Detective Brubaker thus testified that Gatch told him that the appellant had admitted that he "robbed someone on Pulaski Highway." That, to be sure, was hearsay, but the law is long settled that hearsay unobjected to is just as admissible as any other evidence. Chief Judge Carroll Bond stated in *J.A. Laporte Corporation v. Pennsylvania–Dixie Cement Corp.,* 164 Md. 642, 649–50, 165 A. 195 (1933):

> "Objectionable evidence admitted without objection has the force and effect of proper evidence. *Mahoney v. Mackubin,* 54 Md. 268, 274. And it is settled that evidence introduced without limitation of purpose is in for all purposes. *Morri-*

son v. Whiteside, 17 Md. 452, 459; Eckels & Sons Ice Mfg.
Co. v. Cornell Economizer Co., 119 Md. 107, 116, 86 A. 38."
See also Gregg Neck Yacht Club v. Kent County, 137 Md.App.
732, 762, 769 A.2d 982 (2001).

With specific reference to hearsay, Judge Collins observed
in Moxley v. State, 205 Md. 507, 518, 109 A.2d 370 (1954):

Of course, the State's attorney could waive the right to keep
out this hearsay testimony. But, if he does so, the evidence
which comes in has the same probative force as if it were
competent.

And see Martin v. State, 203 Md. 66, 73, 98 A.2d 8 (1953).

In Boggs v. State, 228 Md. 168, 172, 179 A.2d 338 (1962), the
Court of Appeals was also dealing with the unquestioned
admissibility and probative value of unchallenged hearsay:

In addition, the prosecuting witness who resided in the
apartment testified without objection that a neighbor told
her two men were taking items off the roof adjoining her
apartment. This unchallenged hearsay could properly have
been considered by the trial court, Moxley v. State, 205 Md.
507, 109 A.2d 370 (1954), and could have led it to conclude
that the two men were Donnan and the appellant....

This Court held to the same effect, speaking through Chief
Judge Robert C. Murphy in Hyman v. State, 4 Md.App. 636,
642, 244 A.2d 616 (1968):

Although hearsay, Officer Stanley's testimony may be af-
forded the same probative force as if it were competent, the
weight being for the trier of fact. Boggs v. State, 228 Md.
168, 179 A.2d 338; Moxley v. State, 205 Md. 507, 109 A.2d
370. As such testimony was received in evidence, it provid-
ed the necessary foundation for the introduction of the gun
into evidence and consequently no error was committed in
admitting it at the trial.

See also Robinson v. State, 17 Md.App. 451, 462–63, 302 A.2d
659 (1973) ("The evidence, to be sure, was hearsay. It was,
moreover, hearsay twice compounded.... It is relevant and it
is probative."); James v. State, 5 Md.App. 647, 651, 248 A.2d

910 (1969) ("[A]lthough hearsay, it may be afforded the same probative force as if competent.").

## C. A Claim That Was Never Made

Evidence of a reference to Pulaski Highway in the appellant's admission was thus unquestionably in the case. As an artful dodger, the appellant will, faster than the eye can see, shift his attack from one on the absence of such evidence to the "unfortunate" presence of such evidence. He will adroitly redirect attention to his lawyer's bringing out of this evidence in his cross-examination of Detective Brubaker as an *ipso facto* demonstration of ineffective assistance of counsel. There are two dispositive answers to such an inevitable cry of woe.

In the first place, the appellant has never raised a claim that his lawyer's cross-examination of Detective Brubaker constituted a denial of his right to the effective assistance of counsel. Such a charge of ineffectiveness was never made in *Schmitt I* nor *Schmitt II* nor in the Post–Conviction Petition nor in the present appeal from the denial of more sweeping post-conviction relief. Such a claim is not before us. Even if it were, however, it would not prevail.

## D. The Evidence May Only Have Been What Everyone Accepted As Incontrovertedly True

In truth, it may well be that the appellant's admission to James Gatch had actually contained a reference to Pulaski Highway even though Gatch's testimonial narrative neglected to include it. At the post-conviction hearing it was brought out through appellant's trial counsel that in James Gatch's statement to the police, James Gatch had indeed stated that the appellant's admission referred to Pulaski Highway. Trial counsel thus knew that such an inculpatory reference by James Gatch was an actual fact in the case.

In his trial testimony, moreover, James Gatch never denied that such a reference to Pulaski Highway had been made by the appellant. Perhaps through inadvertent incompleteness, Gatch never testified to that specific fact and neither party

sought to pinpoint him further with respect to it. In no event, however, does it appear that Gatch's failure to make a testimonial reference to Pulaski Highway should generate the sinister pall that the appellant now seeks to cast over the trial proceedings.

It seems as if both the State and the defense assumed that James Gatch had testified in the way that they fully expected him to testify. If, as we suspect, trial counsel, subconsciously perhaps, was simply assuming something to be in evidence that he and the Assistant State's Attorney and the police investigators all knew to be a non-controversial fact in the case, the appellant's repeated references to the failure to object to "false evidence" are a bit excessive. Under the circumstances, the term "false" is a harsh label to apply to a momentary lapse of attention on the part of everyone. "Repeated false statements" conjures up images of a Machiavellian prosecutor scheming to poison the minds of the jurors with calculated lies and of a defense attorney, chronically asleep at the switch, permitting the State to get away with it. We ask the appellant to turn down the rhetoric. Lapses are one thing; falsity is something else.

## E. A Good Tactical Decision, Even If A Lucky One

In the second place, trial counsel's cross-examination of Detective Brubaker, whether a conscious trial tactic or just a stroke of luck, produced what we conclude to have been a salubrious result. In the appellant's admission as testified by Gatch, a robbery on Pulaski Highway was substituted for a robbery at an automatic teller machine.

Q: Mr. Gatch didn't tell you that [Schmitt] said anything about an ATM machine, did he? All he said to you was we robbed someone on Pulaski Highway. . . .

A: That's correct.

That appears to us to have been a sound trade-off. An admission about shooting someone at an ATM machine would in the context of this case appear to have been, in our judgment, far more damning that a reference to shooting

someone somewhere on Pulaski Highway. The ATM machine narrows the universe of crime scenes, and particularly of *modi operandi*, more convincingly than does Pulaski Highway. At the very least, the advantage of such a trade-off is tactically arguable and that removes it from the netherworld of *Strickland v. Washington.*

In any event, the evidence that the appellant's admission to James Gatch included a reference to Pulaski Highway came in via the hearsay route and subsequent references to it were, therefore, neither improper nor prejudicial. The introduction of such evidence by defense counsel, moreover, would not have been an instance of ineffective assistance, even if such a claim had been made (it had not).

### Failure to Request an Alibi Instruction

The appellant's second contention is that counsel's representation was ineffective because of the failure to request a jury instruction on subject of alibi. Judge Byrnes ruled that counsel's performance in this regard was deficient but that the deficiency did not create a reasonable possibility that the outcome would have been different had counsel requested such an instruction:

> Witnesses testified that Petitioner was in the hotel room at the time the shots were fired. Trial counsel's primary defense was Petitioner's alibi. Trial counsel's failure to ask for the alibi instruction was deficient. However, trial counsel's omission did not affect the outcome of the case. The issue of Petitioner's alibi was fairly presented to the jury.

### A. The Alibi As An Autonomous Concept

The alibi is an odd juridical animal. The law, not strangely, has responded by treating it oddly. Until 1974, it treated the alibi far more harshly than a mere denial of guilt deserved. Since 1978, by way of overcompensation, it has been treating the alibi with a special solicitude that a mere denial of guilt also does not deserve. There are countless ways to say, "I didn't do it," and what we call an alibi is but one of them. As long as defendants may testify and defense witnesses may be

called, one of the myriad ways of refuting a charge of criminal complicity is to try to show that the defendant was some place else when the crime was committed.

The oddity is that this one particular way of refuting complicity, unlike all other ways, has come to acquire a special tag or label all of its own. As a consequence of that initial oddity, it now enjoys a special handling all of its own. Sound theory, however, is always striving for simplification, and the alibi is a stumbling block in the path of that effort. Two nagging questions will not go away: 1) How did this aberration come to be? and 2) Must this aberration go on forever?

The alibi almost certainly took on an identity of its own because of the popular culture. The dime novels and gangster films of the 1930's gave it a high profile that has never waned. It is hard even to say the word without hearing in the mind's ear the inflections of a James Cagney or an Edward G. Robinson. The word itself is redolent with at least a tinge of the unsavory. God-fearing folk don't need alibis; it is scoundrels and mountebanks who resort to them. (This is one good reason some defense attorneys do not even want the jury to hear the word "alibi" associated with their clients.)

Since the 1930's, the contours of what we call an alibi have actually grown. The coverage of the alibi's special handling has grown correspondingly. Time was when a defendant, by saying, "I was somewhere else," did not create his own alibi. It was a defense, to be sure, but not an "alibi." An alibi was always something that was *provided* by someone else. A defendant's own protestation of having been elsewhere was not considered an alibi and did not provoke any special jury instructions.

██ It has come to be, however, that "the defendant's uncorroborated testimony that he was at some other place at the time of the crime is sufficient to generate the issue." *Smith v. State*, 302 Md. 175, 180, 486 A.2d 196 (1985). No other "alibi" witness is required. In *Robertson v. State*, 112 Md.App. 366, 685 A.2d 805 (1996), this Court went further and held that, even when the defendant himself did not testify, his

out-of-court statement to a police sergeant that he was some-place else at the time of the crime was sufficient, in and of itself, to generate an alibi defense.[1] Notwithstanding *Smith* and *Robertson,* the public usage almost certainly remains that someone else must *provide* a defendant with an alibi. He does not, by some sort of exculpatory parthenogenesis, produce one for himself. The law, however, has been more indulgent as to who may father an alibi.

The law's general response to the alibi defense, initially overly harsh and now perhaps overly solicitous, has been in significant measure a response to the verbal label "alibi" itself with all of its connotative baggage. Perhaps because of the label's unsavory associations, the law's early treatment of the alibi was forbiddingly stern.

As reported in such cases as *Grady v. State,* 24 Md.App. 85, 329 A.2d 726 (1974); *Daniels v. State,* 24 Md.App. 1, 329 A.2d 712 (1974); and *Jackson v. State,* 22 Md.App. 257, 322 A.2d 574 (1974), Maryland's trial courts were through the early 1970's regularly referring to the alibi as an "affirmative defense" and squarely allocating to the defendant the burden of persuasion as to such a defense by a preponderance of the evidence. The instruction before the court in *Daniels v. State,* 24 Md.App. at 3–4, 329 A.2d 712, actually went further in casting a dark shadow over alibi witnesses:

> *Alibi witnesses occupy a strange separate niche of their own in the weighing of evidence in a criminal case. The testimony of alibi witnesses are to be received carefully and subject to careful scrutiny on your part. ... [T ]he burden of proof in this respect is upon the defendant to prove not by a reasonable doubt, but a preponderance of the evidence, the authenticity and truthfulness of the alibi theory and of the alibi witnesses.*

---

1. We did not hold that such a self-serving statement was admissible if objected to. That issue was not before us in *Robertson.* The defendant's statement to the police sergeant was introduced by the State without objection.

When it came to the allocation of the burden of persuasion, the law in those years was clinically schizophrenic. Routinely, a jury instruction would place on the State the burden of proving every element of the crime beyond a reasonable doubt, including, where almost always necessary, the defendant's presence at the scene of the crime. The very next sentence (or perhaps the second next sentence) would then place on the defendant the burden of proving by a preponderance of the evidence that he was someplace else. There was a big problem somewhere in that obviously self-contradictory instruction. Until *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), turned its constitutional focus on the allocation of burdens of proof, however, state courts, including Maryland, had tended not to pay too close an attention to such things. There was a problem that badly needed correcting.

To its credit, Maryland turned its scrutiny on the problem even before *Mullaney v. Wilbur* commanded the states to do so. This Court in *Robinson v. State*, 20 Md.App. 450, 316 A.2d 268 (1974), addressed for the first time "the question of whether alibi is an affirmative defense [and] . . . the defendant's burden of proof vis-a-vis an alibi." 20 Md.App. at 457, 316 A.2d 268. Our holding was clear:

> We think the sound view to be that an alibi is not an affirmative defense, placing any burden upon a defendant beyond the self-evident one of attempting to erode the State's proof to a point where it no longer convinces the fact finder beyond a reasonable doubt. Proof of an alibi, like any other defense testimony, is simply a means of controverting the State's effort to establish criminal agency.

20 Md.App. at 459, 316 A.2d 268. That holding was quoted and expressly approved by the Court of Appeals one year and a half later in *State v. Grady*, 276 Md. 178, 184, 345 A.2d 436 (1975).

Since *Robinson*, that erroneous practice of treating an alibi as an affirmative defense and placing the burden of persuasion as to it on the defendant has been totally eliminated. In the

correcting process, however, the pendulum may have swung too far in the opposite direction. Since instructions today unequivocally place the burden of proving criminal agency (including presence at the scene when pertinent) on the State beyond a reasonable doubt, the value of an arguably redundant alibi instruction (restating the same thing in reverse terms) would seem to be, at most, one of emphasis. When the State proves beyond a reasonable doubt that the crime was committed and that the defendant committed it, it proves beyond a reasonable doubt that the defendant was present, which, *ipso facto*, proves beyond a reasonable doubt that the defendant was not elsewhere.

Because of the staying power, however, of the notion of an alibi in the public mind, even if that emotionally charged word were never uttered in the courtroom, *Pulley v. State*, 38 Md.App. 682, 686–91, 382 A.2d 621 (1978), concluded that it was better to err on the side of redundancy. That the word "alibi" possesses such a staying power in the public mind is clear. The Maryland Pattern Jury Instruction on alibi, for instance, MPJI Cr 5:00, never mentions the word "alibi." The Comment to the instruction makes the reason clear:

> The instruction does not contain the word "alibi" because it may incorrectly suggest that alibi is an affirmative defense.

If the evidence generates an alibi defense and if a defendant requests an alibi instruction, *Pulley* holds that it is reversible error for the court not to give one. Notwithstanding the fact that the court had never referred to an alibi as an affirmative defense, there remained the residual fear that the jury, *sua sponte*, might think of it as such and, accordingly, misplace the burden of proof. "An alibi instruction removes the possibility that the jury will place the burden of proof upon the defendant with respect to the alibi." 38 Md.App. at 689, 382 A.2d 621. We quoted *Wright v. Smith*, 434 F.Supp. 339, 344 (W.D.N.Y. 1977), to the effect that without the arguably redundant instruction, "there is a likelihood that the jury will become confused about the burden of persuasion." Our holding was clear:

We find no merit in the State's contention in the instant case that the requested alibi instruction was "fairly covered" by the trial court's other instructions with respect to the presumption of innocence and the burden of proving the appellant guilty beyond a reasonable doubt.

38 Md.App. at 690, 382 A.2d 621. In *Smith v. State*, 302 Md. 175, 180, 486 A.2d 196 (1985) the Court of Appeals placed its imprimatur on that holding of *Pulley*. See also *Robertson v. State*, 112 Md.App. 366, 386–87, 685 A.2d 805 (1996).

Instead of reacting to an idea, we were and are overreacting to a word. If that be the case, the ideal long-term solution would seem to be for everyone to stop using the word "alibi" and to allow the defense of "I was somewhere else" to merge quietly into the myriad other ways of saying "I didn't do it." As a consequence, there would no longer be a need for the special jury instruction now deemed necessary to sedate the possible jury overreaction to the supercharged word. That is the approach now being taken by the Maryland Pattern Jury Instructions in eschewing the very mention of the word "alibi." Indeed, in the Comment on MPJI–Cr 5:00, the Committee explained that its "separate alibi instruction was designed to satisfy the requirements of *Smith [v. State]* and *Pulley [v. State]*."

Once the reason for a rule disappears, the rule itself will linger for a decade or two (or three or four) but ultimately disappear itself. This temporary aberration will not last forever. It is, however, still before us in this case.

## B. The Performance Component: Was An Alibi Defense Generated?

At the outset we have some doubt as to whether an alibi instruction would even have been appropriate under the circumstances of this case. Alibi has traditionally been defined as "[a] defense that places the defendant at the relevant time of crime in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." *Black's Law Dictionary* 71 (6th ed.1990). That

definition consists of two significant adverbial phrases, not one, and they are, moreover, in the conjunctive. Defendants rally to the phrase "in a different place than the scene involved" as a self-sufficient exculpatory mantra. There is all too frequently a convenient ellipsis of the further qualifier "and so removed therefrom as to render it impossible ... to be the guilty party." When exactly is a place "so removed therefrom" as to qualify as "a different place?"

The stock alibi is the testimony of the devoted mother or suborned girlfriend that the suspect "was at home with me" at the very moment the gas station was being robbed. Is it still an alibi, however, if "at home" is right across the street from the robbed gas station? Perhaps, but it is at least more problematic. The purpose of an alibi, of course, is to be exculpatory. Is it still an alibi, therefore, if the crime scene and the alibi venue are in such suspicious proximity as to make one's presence at that spot in part exculpatory but also in part inculpatory? There is an ambiguous borderline.

Assuming that the only issue in the case is whether the defendant was the principal in the first degree, is it an alibi, worthy of a special alibi instruction, for him to say, "I could not have been the trigger man for I was outside at the wheel of the getaway car?" Technically, perhaps, but the polling results on that question will not be impressive.

Jerry Mathis was shot and killed across the street from the Pilot Motel at between 1:45 and 2:00 A.M. Everyone placed the appellant at the Pilot Motel between 1:45 and 2:00 A.M. The appellant's claimed alibi is that he was inside the motel rather than outside when the fatal shots were fired. Is that an alibi in microcosm but a non-alibi in macrocosm? The defense witness who ostensibly provided him with an alibi was Anthony Mixter. The appellant did not testify in his own defense.

Mixter testified that he and the appellant arrived at the Pilot Motel at between 1:30 and 2:00 A.M. He testified that he was in the bathroom of their motel room when he heard shots. He testified that the appellant was in the motel room when he,

Mixter, came out of the bathroom. He never said how long he was in the bathroom. In a statement given to Detective Brubaker, moreover, Mixter acknowledged that he did not know whether the appellant was in the motel room at the time the shots were fired because the bathroom door had been closed.[2]

Was an alibi defense generated in this case? It is a close call, but technically it may have been. It was not, however, so unmistakably identifiable as an alibi defense from way down the glen as to brand the failure to recognize it as a mark of lawyerly incompetence.

In this regard, it behooves us to remember what we said in *State v. Gross,* 134 Md.App. 528, 551, 760 A.2d 725 (2000), *cert. granted,* 362 Md. 623, 766 A.2d 147 (2001), about the "performance component":

> With respect to the performance component—the assessment of whether trial counsel's representation was *so deficient as to undermine the adversarial process*—*Strickland* pointed out:
>
>> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors *so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment."*
>
> 466 U.S. at 678, 104 S.Ct. 2052. *Strickland* then admonished that counsel is not to be measured against an ideal standard but is to be assessed in terms of *whether his lawyerly assistance was "reasonable"* and that *that is to be measured "under prevailing professional norms"*[.]

134 Md.App. at 551, 760 A.2d 725 (emphasis supplied). See also *Gilliam v. State,* 331 Md. 651, 665–66, 629 A.2d 685 (1993) ("The Sixth Amendment does not require the best possible

---

**2.** The appellant's girlfriend, Nancy Reinhardt, was called as a State's rebuttal witness. She testified that the appellant arrived at the motel room at between 1:30 and 1:45 A.M. and that she heard gunshots about five minutes after his arrival. In an earlier signed statement to the police, however, which she recanted on the stand, she had said that the appellant did not enter the motel room until 2:30 A.M.

defense or that every attorney render a perfect defense. In order to be deficient, counsel's acts or omissions must be outside the wide range of professionally competent assistance.").

We hold that the failure to request a special alibi instruction in this case was not an omission "so deficient as to undermine the adversarial process" or an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

 Post-conviction lawyers, and even post-conviction judges, need reminding periodically that whether lawyerly assistance is reasonable is not to be measured against an ideal standard but is to be measured "under prevailing professional norms." A "C" will not put one on the Dean's List but it is a passing grade, and that is all the Sixth Amendment requires. As *Gilliam v. State*, 331 Md. 651, 665–66, 629 A.2d 685 (1993), observed, "The Sixth Amendment does not require the best possible defense or that every attorney render a perfect defense."

### C. The Performance Component: Trial Strategy

 In this case, of course, trial counsel did not fail to recognize the appellant's entitlement to an alibi instruction, if he wanted one. He simply did not want one. His strategic assessment of the instruction was that it was a meaningless redundancy. At the post-conviction hearing, trial counsel explained that he did not request an alibi instruction because "[an] alibi instruction says you are to consider and apply the evidence along with any other evidence in the case. To me that tells the jurors absolutely nothing."

 The entitlement to an instruction if you want one does not imply that you are derelict for not wanting one. By analogy, a defendant is constitutionally entitled to an instruction that his failure to take the stand will not be held against him. It is perfectly sound trial strategy, however, to wish to forego such an instruction so as not to draw the jury's attention to the inevitably suspicious failure to take the stand, *Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d

319 (1978). In this case, counsel may not have wanted to raise any specter possibly suggested by the word "alibi."

Alternatively, he may not have wanted to clutter the minds of the jurors with a lot of legal gobbledygook that he deemed meaningless. Some attorneys, of course, like the scattershot approach: spray the jury with every bit of verbal grapeshot you have in your arsenal. Other equally good attorneys prefer to keep the attack simple and to hammer at one or two of the enemy's perceived weak points. *Gilliam v. State*, 331 Md. at 670–71, 629 A.2d 685. It is quintessentially a matter of strategic choice. It is George B. McClellan versus Ulysses S. Grant and who will presume to post-mortem the battle?[3]

Counsel had available to him *Pulley v. State* and *Smith v. State* but he chose not to use them. They are, of course, opinions worthy of precedential respect. In terms of what they accomplish in a courtroom, however, they are not necessarily five-star decisions that inspire trial advocates to snap to attention and salute. Counsel did not think they would help him. Who are judges to second-guess such an on-the-spot assessment by a combatant on the field?

In cautioning against such second-guessing, *State v. Gross*, 134 Md.App. at 552–53, 760 A.2d 725, was very clear:

> In guarding against too facile a finding of deficient performance by trial counsel, the Supreme Court circumscribed after-the-fact review, by post-conviction court and appellate court alike, with a number of cautionary admonitions. One of those is that "judicial scrutiny of counsel's performance must be highly deferential" and that reviewing courts should be especially careful not to judge a performance through the distorting lens of hindsight.
>
> It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining

---

**3.** McClellan paid meticulous attention to every small detail, many of which Grant chose deliberately to ignore. Was Grant's performance thus ineffective? A West Point examination paper (or a post-conviction petition) might suggest Yes. The verdict of history is No.

counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight,* to reconstruct the circumstances of counsel's challenged conduct, *and to evaluate the conduct from counsel's perspective at the time.* Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689, 104 S.Ct. 2052 (citations omitted; emphasis supplied).

*Strickland v. Washington* was very emphatic that there is a strong presumption that counsel's decisions were made in the exercise of reasonable professional judgment and that the burden is on the defendant to overcome that presumption:

*[A] court* deciding an actual ineffectiveness claim *must judge the reasonableness of counsel's challenged conduct* on the facts of the particular case, *viewed as of the time of counsel's conduct.* A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.... [T]he court should recognize that *counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.*

466 U.S. at 690, 104 S.Ct. 2052 (emphasis supplied).

In *Oken v. State,* 343 Md. 256, 283, 681 A.2d 30 (1996), Judge Raker confirmed that Maryland recognizes and applies that strong presumption as to the effectiveness of counsel's performance:

To establish that a deficiency existed, Oken must demonstrate that his counsel's acts or omissions were the result of unreasonable professional judgment and that counsel's performance, given all the circumstances, fell below an objective standard of reasonable considering prevailing professional norms. *Oken must* also *overcome the presumption that the challenged action might,* under the circumstances, *be considered sound trial strategy.*

(Citations omitted; emphasis supplied).

With respect to the disinclination (not the failure but the disinclination) of trial counsel to request a special alibi instruction, we see no deficiency in terms of his trial performance.

### D. The Prejudice Component: Would An Alibi Instruction Have Made Any Difference?

Having found no deficiency in the performance component, it follows that there can be no prejudice flowing from a deficient performance. Even having found a deficient trial performance, Judge Byrnes found no reasonable possibility that, but for the deficiency, the verdict would have been different. *A fortiori,* there was no such reasonable possibility absent any deficiency.

### Failure To Request A Mistrial

 The appellant's third claim of ineffective performance resulting in trial prejudice is way off the mark. It attacks a trial tactic that was adroitly opportunistic.

The State thought it had a witness, a fellow prisoner of the appellant's named Jerry Scharf, whose testimony was going to clinch its case. The appellant's admissions to Jerry Scharf were to be the centerpiece of the prosecution's case. In opening statement, the Assistant State's Attorney confidently foretold the devastating proof of guilt the State was expecting to produce:

Over at the Detention Center the Defendant talked. He was already under arrest and charged with this murder and he befriended an inmate over at the Detention Center.

Now, you have to expect that inmates over at the Detention Center—that inmate is now my witness—is not going to be Father Mulcahey, he is not going to be Sister Rose Ann; it is a person that lives in that culture, it is a person that had been housed in the Detention Center. I'm going to produce a witness who is a criminal, but a criminal that knows something; a criminal, a thief who talked to the Defendant and the Defendant told him things about his involvement in this crime.

* * *

The Defendant told him a lot of things. He told him he was at the Pilot Motel, that he was in need of money, and that he owed people money. The snitch will tell you that the Defendant said that they robbed a guy or tried to rob a guy at the ATM machine and he said somebody shot him but he couldn't remember who. The snitch will say the Defendant told him we tried to rob someone, I don't know whether it was—it was either me or Tony [4] that shot him, I just don't know.

The State, however, was in for a rude surprise. Jerry Scharf, no longer in jail, failed to respond to his summons. Just before the State rested its case, the embarrassed Assistant Attorney apologized to the trial judge:

"Judge, at this point, . . . the State had anticipated calling two additional witnesses, one by the name of Jerry Scharf who has been named the snitch. *I'm unable to produce that witness.* We made all efforts last night to find him. The homicide detectives were looking for him and we have been unable to find him. *He is not here.*"

(Emphasis supplied).

That was a surprise development that invited spur-of-the-moment strategic improvisation. The prosecution had over-

---

4. If "Tony" was Anthony Mixter, that part of the appellant's admission could have been very damaging to the credibility of the appellant's key alibi witness.

loaded its opening statement with promised evidence that unexpectedly it could not produce. That could well have been, of course, the predicate for the declaration of a mistrial. To call for one is the instinctive reaction that first comes to mind.

But to what end? Strategy entails looking beyond the immediate moment. It calls for thinking outside a small box. A mistrial is routinely followed by a retrial. Does one, therefore, demand immediate redress or may not suffering minor damage now represent a fortuitous opportunity to avoid greater damage later on? When the opening unexpectedly appears, does not one happily sacrifice a knight or a bishop to knock off the opposing queen? Might it not, indeed, had been ineffectiveness *per se* to have failed to seize such a golden opportunity?

The trial judge immediately asked if defense counsel would make any motions "in light of the fact that the State is not going to produce Mr. Scharf." Counsel intuitively grabbed the initiative, "No, Your Honor . . . I'm pleased that they are not calling him." At the post-conviction hearing, he further explained his strategy:

> I was certain that the State would, if a mistrial were granted, [the] State would produce Mr. Scharf for the next trial.

Judge Byrnes ruled that trial counsel's performance in that regard was not deficient:

> Trial counsel argues that as a matter of trial tactics, he chose to address the missing witness in his closing argument, rather than ask for a missing witness instruction or for a mistrial. Trial counsel contends that he did not want a mistrial because he believed that Scharf would be called at the next trial. It was a judgment call by counsel.

We not only affirm Judge Byrnes's ruling, but our endorsement of counsel's reflexive adjustment to unforeseen events is even stronger. When in the din of battle you suddenly spot that your opponent is missing a key unit, that is precisely the moment to press the battle home at all costs and in no event permit him a chance to regroup. Hit Wellington before

Blucher can come on to the field! When the State was caught off balance without Jerry Scharf, that was, realistically, the one and only chance the appellant ever had to escape with a not guilty verdict in this case.

The opening statement, to be sure, hurt a bit, but not nearly as much as the live testimony of Jerry Scharf would have hurt at a retrial.[5] The opening statement, moreover, could be significantly, even if not totally, neutralized by the routine instruction that such statements are not evidence and should not be considered as such. Live testimony at a retrial could not be so neutralized.

Had the appellant 1) requested and received a mistrial and 2) then been convicted at a retrial following the live testimony of Jerry Scharf, he would probably now be claiming that his first trial counsel had been ineffective for having given the State, when it was on the ropes, the opportunity to recover and to present a stronger case at a later date. Had the State asked for a mistrial so that it could locate its key missing witness and had the appellant acquiesced in that request, the inevitable claim of ineffective assistance would be irrefutable. Such a counterproductive result, however, is exactly what the appellant is now claiming he should have received. He should, instead, be thanking his counsel for having avoided it.

■ Our consideration of this contention also tells us something generally about the measuring of prejudice in an ineffective assistance of counsel claim. Prejudice is not an absolute. It is a relative thing that depends on the circumstances of each case. To invite a lesser harm to avoid a greater harm is not prejudice; it is the avoidance of prejudice.

---

5. By way of counterpunching, moreover, trial counsel in his own opening statement had given tit-for-tat. At the post conviction hearing, he testified that he believed that he had effectively neutralized Jerry Scharf by describing him as "a petty thief" and "a professional witness" and by promising that both Scharf's ex-wife and a prison official would testify that he was "a habitual liar." Compare *Bowers v. State,* 320 Md. 416, 435, 578 A.2d 734 (1990).

As it was, the appellant was convicted in any event, even without the testimony of Jerry Scharf. We must remember, however, what Judge Thieme taught us in *Cirincione v. State*, 119 Md.App. at 492, 705 A.2d 96:

[T]he fact that the selected strategy was ultimately unsuccessful does not mean that it was an unreasonable choice.

*Gilliam v. State*, 331 Md. 651, 666, 629 A.2d 685 (1993), spoke to the same effect: "The courts should not, aided by hindsight, second guess counsel's decisions."

 The appellant's alternative subcontention that his counsel should have asked for a missing witness instruction is inconsequential. He may or may not have been entitled to it, but a missing witness instruction is a bland thing in any event. In closing argument, moreover, defense counsel demeaned the State's case by pointing out how it had first promised but then failed to deliver. Many trial counsel believe, probably with some justification, that they can communicate a desired message to the jury far more effectively than can a somewhat pedantic instruction from the bench. In any event, the issue is trivial.

### Failure to Impeach a Witness With a Prior "Conviction" for Theft

 The appellant's fourth contention is that trial counsel was ineffective for failing to investigate Germaine Churma's background and to impeach her credibility with a prior conviction for theft. Judge Byrnes held that defense counsel's actions amounted to proper "trial tactics" and that the appellant did not meet his burden of showing that defense counsel's performance was unreasonable.

Churma actually did not have a prior *conviction* for theft. The record reveals that on July 7, 1993, she received probation before judgment ("PBJ") after being charged with theft under $300. Therefore, impeachment based on Maryland Rule 5–609 did not apply. See Maryland Rule 5–609 ("Impeachment by evidence of *conviction* of crime.")(emphasis supplied). *Myers v. State*, 303 Md. 639, 647–48, 496 A.2d 312 (1985) ("Probation

before judgment . . . is not a conviction."); *Ogburn v. State,* 71 Md.App. 496, 501, 526 A.2d 614 (1987).

Any possible impeachment value of Ms. Churma's PBJ for theft under Rule 5–608(b) ("Impeachment by examination regarding the witness's own prior conduct not resulting in conviction") must satisfy the requirement that the conduct is probative of a character trait of untruthfulness. At the post-conviction hearing, the appellant offered no evidence regarding Ms. Churma's conduct that formed the basis of the theft charge or how that conduct potentially would have impacted on Ms. Churma's character for truthfulness.

More to the point, this contention is a tempest in a teapot. The appellant's petition beseiged Judge Byrnes with a scatter-shot claim of twenty-two alleged trial errors. Claim # 17 was the unilluminating charge that "trial counsel failed to impeach a witness who placed Petitioner at the scene." The witness in question was Germaine Churma. An earlier contention, # 6, had similarly accused counsel of failing to attack Germaine Churma's credibility in another regard. In disposing of Claim # 6, Judge Byrnes ruled, *inter alia,* that "trial counsel's strategy had no effect on the outcome of this case." In subsequently addressing Claim # 17, he simply referred to his disposition of Claim # 6.

We agree that a peripheral attack on Germaine Churma's credibility would have had "no effect on the outcome of their case." Churma's testimony was that the appellant was not in the motel room when the shots were fired. That testimony was effectively corroborated 1) by the testimony of Priscilla Jones, the desk clerk, and 2) by the statement given to the police by Nancy Reinhardt, the appellant's girlfriend. It was further bolstered by 1) the appellant's suspicious inquiry made to Officer Susan Markowski and 2) his later admission to James Gatch.

Germaine Churma was on September 18, 1990 a part of the appellant's "social set." The appellant's companion Tony Mixter was Churma's ex-boyfriend. Mixter and the appellant picked her up at the Red Room on Eastern Avenue at about

1:00 A.M. and took her to the Pilot Motel. She had no apparent motive to testify falsely against the appellant.

If the jurors were going to be for any reason skeptical about Germaine Churma's credibility, it was going to be, realistically, for reasons other than her minimal criminal record. She was a topless dancer at a bar on Eastern Avenue. At one o'clock in the morning, she went with two men to a cheap motel on Pulaski Highway. Several other persons may have joined them in the motel room for a night of "partying." From the statement the appellant gave the police and from the testimony of Tony Mixter, there was evidence that several persons in the room had been using cocaine. If the jury was going to look askance at Germaine Churma, it was going to be because of her life style and her life history and not because of a PBJ for petty theft.

In addition to agreeing with Judge Byrnes that there was no deficiency with respect to the performance component, we also hold that there was no showing of prejudice. With respect to the "prejudice component" of *Strickland v. Washington*'s two-pronged test, this Court observed in *State v. Gross*, 134 Md.App. at 554, 760 A.2d 725:

> *Strickland v. Washington* then carefully pointed out that even if an "error by counsel" is demonstrated, such an error, "even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691, 104 S.Ct. 2052.

It is the appellant who bears the burden of proving prejudice, and the appellant's required showing in that regard is substantial. As *Strickland v. Washington* itself observed:

> "Even if a defendant shows that particular errors of counsel were unreasonable, . . . the defendant must show that they actually had an adverse effect on the defense.

> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test and not every error that conceivably could have

influenced the outcome undermines the reliability of the proceeding."

466 U.S. at 693, 104 S.Ct. 2052. *State v. Gross* went on, 134 Md.App. at 555, 760 A.2d 725:

> The heavy burden on the defendant is to show a reasonable probability that the outcome of the trial would have been different:
>
>> "The defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."

466 U.S. at 694, 104 S.Ct. 2052.

On the subject of *Strickland v. Washington*'s "prejudice component," a very fundamental observation is in order. The failure of a petitioner to show prejudice in the context of an ineffective assistance claim and the showing by the State of harmless error on a direct appeal are by no means mirror images of each other. There is a tendency on the part of many ardent attorneys, however, to conflate the two and thereby, sometimes, to flip the burden. 1) The propositions to be proved, 2) the burdens of proof, and 3) the allocations of those burdens are all critically different.

Once trial error is shown on a direct appeal, prejudice is presumed and the heavy burden is on the State to persuade the appellate judges **BEYOND A REASONABLE DOUBT** that the error was harmless, to wit, that the result **WOULD NOT HAVE BEEN DIFFERENT** even if the error had never occurred. On an ineffective assistance claim, by contrast, the allocation of the burden is just the opposite. Even after a finding of a deficient trial performance, the presumption against trial prejudice still abides and the burden is on the petitioner to prove prejudice, to wit, **A REASONABLE POSSIBILITY** that the verdict **WOULD HAVE BEEN DIFFERENT.**

The subject matter being critiqued by the two proceedings, moreover, is vastly different. In the one case, it is lawyerly performance. That is a more general appraisal. In the other, it is judicial error. That is a discrete event. The two do not have the same capacity to generate adverse presumptions.

There will self-evidently be numerous occasions where post-conviction petitioners fail to prove trial prejudice from the failure to raise an issue where, were the case on direct appeal from an erroneous ruling by a trial judge on such an issue, the State could not prove harmless error.

### Cumulative Performance And Cumulative Prejudice

The final contention is a claim that the cumulative effect of the errors committed by trial counsel rendered counsel's performance ineffective and thus warranted a new trial. In actuality, that is the only claim that ultimately matters.

Although there is on the part of both post-conviction hearing judges and reviewing appellate judges alike an inevitable and probably necessary tendency to analyze the various sub-contentions on a one-by-one basis, the ultimate *Strickland v. Washington* issues are unfragmented monoliths. Looking at the trial as a whole, was trial counsel's performance "outside the wide range of professionally competent assistance?" *Harris v. State,* 303 Md. at 697–99, 496 A.2d 1074. Looking at the trial as a whole, was there "a reasonable possibility that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt?" *Id.* at 699–701, 496 A.2d 1074. Looking at the performance component and the prejudice component in combination, was the petitioner ultimately denied the right to the effective assistance of counsel guaranteed by the Sixth Amendment. *Id.* at 701, 496 A.2d 1074.

As we undertake to answer those cumulative or aggregate questions, there are a few nuances as to what we cumulate or aggregate and how we cumulate or aggregate.

### A. The Performance Component: How We Aggregate

We must distinguish the particular errors established by post-conviction petitioners, those things that may be indi-

vidual lapses in effective trial practice, from the ultimate evaluation of counsel's overall trial performance. No single lapse or misstep may constitute a deficient trial performance in and of itself but a combination of them may. In assessing the overall trial performance, therefore, we will aggregate all the errors or lapses that may be found to have occurred.

We do not, on the other hand, aggregate mere allegations of trial error. If this Court's conclusions as to the individual sub-contentions are that there were no errors, lapses, or breaches of good procedure, such non-errors, non-lapses, or non-breaches do not aggregate and do not figure in any way into the compilation of errors that might yield a deficient trial performance. Two or more non-errors do not combine to make an error.

In *Gilliam v. State*, 331 Md. 651, 667–85, 629 A.2d 685 (1993), the petitioner urged on a post-conviction hearing and ultimately on the Court of Appeals two instances of ineffective assistance at a suppression hearing, four such instances at his trial, and seven more instances at his sentencing hearing. The Court of Appeals rejected each of those subcontentions. The appellant finally raised a claim as to "The Cumulative Effect of the Ineffective Assistance Claims." 331 Md. at 685, 629 A.2d 685. In rejecting the cumulative claim, Judge Chasanow explained how mere allegations of error, as opposed to findings of error, do not aggregate:

> Gilliam also contends that the "cumulative effect" of his ineffective assistance claim should entitle him to post-conviction relief. In the instant case, we see no basis to conclude that Gilliam's claims collectively have any greater force than they have individually. *Compare Bowers v. State*, 320 Md. 416, 436–37, 578 A.2d 734, 744 (1990) (cumulative effect of related claims was sufficient to establish ineffective assistance of counsel). This is not a case where the cumulative effect of numerous interrelated errors in aggregate amount to inadequate representation. *This is more a case of the*

*mathematical law that twenty times nothing is still nothing.*

331 Md. at 685–86, 629 A.2d 685 (emphasis supplied).

On this appeal, the appellant has raised four issues of allegedly ineffective trial performance. We have held that in none of those instances did counsel's conduct constitute an error, lapse, or breach in any respect. By analogy to Judge Chasanow's "twenty times nothing is still nothing," in the case before us four times nothing is still nothing.

This is not to say, however, that with respect to the performance component, the aggregation of individual trial errors or lapses is not sometimes appropriate. Few trial performances are perfect. There are frequently minor tactical errors and lapses of judgment along the way. Although no individual lapse or error may in and of itself constitute a deficient overall trial performance, a combination of them may.

The holding of *Bowers v. State,* 320 Md. 416, 428–29, 578 A.2d 734 (1990), was that two specific failures by trial counsel combined to render trial counsel's trial performance deficient. In an alternative holding, the *Bowers* court dealt with "the cumulative effect of numerous errors:"

Because of what we have just held, it is not essential that we review any of Bowers's other contentions. Nevertheless we shall do so because an alternative ground for our holding is that *the cumulative effect of numerous errors on the part of Reddick also deprived Bowers of the effective assistance of counsel.*

320 Md. at 431, 578 A.2d 734 (emphasis supplied).

The *Bowers* court found a number of individual errors or lapses. Together they yielded a deficient trial performance:

We think the numerous lapses we have recounted are sufficient, taken all together, to show inadequate performance.

320 Md. at 436, 578 A.2d 734.

## B. The Prejudice Component: How We Aggregate

 Where there is no deficiency with respect to the performance component, as in this case, there *ipso facto* can

be no prejudice. Where there is a deficient trial performance, on the other hand, there may or may not be resulting prejudice. An ultimate finding of ineffective assistance, of course, requires both a finding of an inadequate trial performance and a finding of consequential prejudice.

Just as individual instances of demonstrated trial error, as opposed to unfounded allegations thereof, may be aggregated, so too may particular instances of consequential prejudice. Even though an individual instance of prejudice may not be enough, standing alone, to overturn a verdict, an accumulation of prejudice from two or more errors may well be enough to undermine confidence in the reliability of the trial verdict. In the *Bowers* case, the post-conviction hearing judge chose to look at each instance of prejudice in a vacuum. In reversing his ruling, Judge Adkins wrote for the Court of Appeals:

> The post-conviction judge thought otherwise, but his approach was to consider each charge of deficient performance and consequent prejudice, and to decide that no one charge alone was serious enough to meet both *Strickland* tests. That approach was incorrect. It is necessary to look at the trial as a whole.

> Even when individual errors may not be sufficient to cross the threshold, their cumulative effect may be.

320 Md. at 436, 578 A.2d 734.

We affirm Judge Byrnes's ruling that the appellant was not denied his right to the effective assistance of counsel guaranteed by the Sixth Amendment and that no new trial should have been awarded.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**