4 A.3d 72

**Perry SIMMS a/k/a Perry Sims**

v.

**STATE of Maryland.**

**No. 1509, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Sept. 3, 2010.

Scott M. Edson (Elizabeth L. Julian, Acting Public Defender, on the brief) Baltimore, MD, for appellant.

Gary E. O'Connor (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: HOLLANDER, *SALMON, MEREDITH, JJ.

HOLLANDER, J.

Following a trial in August 2008, Perry Simms, a/k/a Perry Sims, appellant, was convicted by a jury in the Circuit Court for Baltimore City of manslaughter in connection with the fatal shooting of twenty-eight year old Paul Cornish.[1] Appellant was also convicted of two handgun offenses. Sims, who was eighteen at the time of the offenses, was sentenced to a total of thirty years in prison.

On appeal, we must determine, *inter alia,* whether the trial court erred by permitting the State to introduce at appellant's trial a redacted version of his pretrial alibi notice, even though appellant did not testify or present a defense case. Appellant poses the following three questions:

1. Is Mr. Sims entitled to a new trial because the trial judge erroneously permitted the prosecution to introduce to the jury Mr. Sims's pretrial alibi notice even though Mr. Sims did not testify or call any witnesses at trial?

2. Is Mr. Sims entitled to a new trial because the trial judge acted as a co-prosecutor by asking questions that improved and expanded upon prosecution witness testimony? *See Diggs v. State,* 409 Md. 260, 973 A.2d 796 (2009).

---

* James P. Salmon, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

1. Appellant was acquitted of first-degree murder and second-degree murder.

3. Is Mr. Sims entitled to a remand for the purpose of seeking a sentencing revision (Md. R. 4–345(e)(1)(B)) and a sentencing redetermination from a three-judge panel (Md. Code Ann., Crim. Proc. § 8–102 & Md. R. 4–344) because his trial counsel was constitutionally ineffective in failing to take advantage of either procedure, even though the eighteen-year-old Mr. Sims was sentenced to the statutory maximums resulting in thirty years in prison?

For the reasons set forth below, we answer Question 1 in the affirmative. Therefore, we shall reverse and remand for a new trial. Our disposition of the first issue makes it unnecessary for us to address the remaining questions, as they are not likely to recur on remand.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 9, 2007, appellant was charged with the first-degree murder of Paul Cornish on June 30, 2007. *See* Md. Code (2002), § 2–201 of the Criminal Law Article ("C.L."). He was also charged with use of a handgun in the commission of a felony and crime of violence, in violation of C.L. § 4–204; and wearing, carrying or transporting a handgun, in violation of C.L. § 4–203. E.D. Eshmont entered an appearance as defense counsel on August 31, 2007. Eshmont was replaced on January 30, 2008, when Audre Davis–Robinson, Assistant Public Defender, entered her appearance.[2] Shortly thereafter, on February 5, 2008, Davis–Robinson filed a Notice of Alibi Witnesses, pursuant to Md. Rule 4–263(d)(3).[3] It listed eleven names and addresses, including that of appellant's father, Perry Simms, Sr.

The trial was held six months later, in August 2008. What follows is a summary of the evidence adduced at trial.

---

**2.** The reason for the change of counsel is not clear from the record. We note that defense counsel's name also appears in the record as Davis and as Robinson–Davis.

**3.** The current version of the rule is now found, without substantive change, in Md. Rule 4–263(e)(4).

On the evening of June 30, 2007, shortly before 9:00 p.m., Apollo Thompson and the victim were at the corner of Lloyd and Granby streets in Baltimore City. Thompson testified that they were "just hanging right there getting ready to go to the club. We was drinking." While there, they noticed a man riding his bicycle on Granby Street. Thompson recounted:

We was looking at him to see who it was. We didn't recognize the dude. I wasn't really paying him no mind but Paul was and him and the dude was having some strong eye contact. . . . And Paul was saying something like, you know, who the fuck is that? What the fuck is he looking at?

The person on the bicycle made a left turn on Lloyd Street and disappeared from view. Thompson stated: "I walked to the corner to see where he was at." Thompson recalled, "he's still right there. He didn't go no where." According to Thompson, Cornish "was like let's go see what the fuck his problem is." Thompson continued:

After he said that, I was like "well, come on." Then we started walking across the street. Once we got to the corner, I approached the dude first on the bike 'cause I was walking in the front. And I walked right up to him and I put my finger in his face and I looked at Paul and said "this nigger right here."

After I said that, the dude dropped down the bike said "this nigger right here what?"

Thompson was asked how close he was to the person on the bicycle. He answered: "Like right next to him, like two feet." Thompson claimed that the man on the bicycle got off of his bike and pulled a gun out and kept repeating, " 'this nigger right here what?' " Thompson stated: "And we just saying 'all right, ain't no problem. Chill out. Chill out.' " Thompson "ran across Lloyd Street, across Granby Street, into the parking lot on the other side of Lloyd Street. On the opposite corner where he was at." Thompson denied that he (Thompson) had a knife in his possession.

After Thompson started running, he heard "five or six" gunshots. Thompson explained that he did not see Cornish as

he was running away because Thompson's "back was turned." When he returned to the corner a few seconds later, he saw Cornish on the ground with blood coming from his leg. Cornish was transported to Johns Hopkins Hospital, where he died of his gunshot wounds.[4]

Thompson testified that after he left the hospital, he "went back down to the area, Lloyd and Granby" because that was where his car was parked. According to Thompson, he did not speak to the police because "that just ain't what people do 'round the way." Thompson was not contacted by the police until June 1, 2008. He gave a statement to Baltimore City Police Detective Juan Diaz.

On direct examination, the prosecutor did not ask Thompson if he could identify Mr. Sims. On cross-examination, however, Thompson was asked if Mr. Sims was "the man who was on the bike that night[.]" Thompson responded, "No." He agreed that Sims "is lighter than the man who was on the bike[.]" On redirect, the following exchange took place:

[PROSECUTOR:] . . . When you testified, did you indicate that the person sitting at the table is not the person who was on the bike or did you testify under oath that you are not sure?

[THOMPSON:] I said it don't look like him. That's what I said I think.

[PROSECUTOR]: Did you say "I don't know"?

[THOMPSON]: I don't remember.

[PROSECUTOR:] Court's indulgence. And then counsel questioned you about how long you had an opportunity to see the person on the bike as they rode down Granby

---

4. Tasha Greenberg, M.D., Assistant Medical Examiner, testified that the victim sustained two gunshot wounds. One was to the left buttock and the other was to the back. The bullet to the back went through several organs, including the liver, the diaphragm, and the inferior vena cava. She opined that the manner of death was homicide.

Street. When you first saw, total, how much time did you spend looking at the man on the bike on Granby Street?

\* \* \*

[THOMPSON:] Face I just had like a couple quick glances, like maybe two or three seconds.

Brent Huggins testified that on the night of June 30, 2007, he was outside of his residence, located at the corner of Lloyd and Granby, with his sister, Montcreal;[5] his cousins; and a couple of "homeboys." Sims arrived on a bicycle and spoke to Ms. Huggins. About five or ten minutes later, "two men approach, comes around the corner, very awkward—very peculiar, and (Unintelligible) approaches Perry Simms." Huggins knew one of the two men as "Apollo." He testified: "I noticed Perry starting to back up while he was on his bike. And they continued to approach him. After they continue[d] to approach him, he suddenly started to drop the bike." Huggins recounted that Sims "warned them not to come closer. However, they kept coming. They would not stop." Sims then "pulled a weapon out" and "they still continued to come forward. And he wasn't pointing or aiming it at them at all, at first. It was just basically down, but they continue to come."

Huggins continued: "Once they kept coming he aimed, and then that's when they decided to start walking away." Huggins noted that "it was as if they didn't care, so they kept coming, ready to attack him. So he—after they kept coming, he aimed. Not at them. He was just—he just shot." He added that, at the time that the gunfire was initiated, the two men were "backing up," away from Sims. Huggins indicated that, at the time, "Montcreal was . . . in the doorway" and "not in reach of Perry."

When asked if he saw Sims shoot anyone, Mr. Huggins said: "No, I did not see him shoot him." Huggins also agreed that

---

**5.** Throughout the transcript, Ms. Huggins's first name appears as "Montreal" or "Montrel." She spelled her name "M–O–N–T–C–R–E–A–L."

he did not "know ... if someone was shot at all." Further, Huggins said: "[H]e was not aiming at anybody, pretty much."

In addition, Mr. Huggins testified: "[O]nce I heard—once he shot, that was it. I was gone. I don't know what happened after that." Mr. Huggins explained that he "fled the scene" because he "didn't want to be a part of none of that." He also claimed that he did not contact the police that night to report what he saw because he was "scared[,] ... frightened[,] ... didn't know what to do."

The State introduced a photo array shown to Mr. Huggins by Detective Diaz on July 10, 2007. Mr. Huggins had identified Sims as "the person who committed the crime." On the back of the photo array, Mr. Huggins wrote:

This person is someone who makes surprised [sic] appearances at the basketball club. From what I've seen, he's not a person who would commit a crime such as this. The crime happened out of self-defense. This whole crime wouldn't have happened if the two men wouldn't have approached him at the first place. I know him as Perry. Once approached by the two men, he pulled out a handgun, not to kill but to send a warning to back off. He had a look that may have seemed scared and confused, and out of desperation he fired the gun. After the first shot, I don't know what happened.

Mr. Huggins saw Mr. Thompson with a knife "on his hip, on his pants," but Thompson never removed the knife from his pants. However, when questioned by the police on July 10, 2007, Huggins did not indicate that Mr. Thompson had a knife. He explained that he was "confused, scared, you know, I didn't know what was happening."

The State showed Mr. Huggins the statement he gave to the police on July 10, 2007. Mr. Huggins read from it as follows: " 'What made it seem like [Sims] wasn't going to kill no one is he moved the young lady Montreal [sic] out of the way'—I mean 'out of the way so that she wouldn't get hurt.' " Mr. Huggins explained the discrepancy between his earlier testi-

mony, in which he indicated that Montcreal was out of "reach of Perry," and his statement of July 10, 2007, as follows: "That's when everything was fresh in my mind. Some of it's not even fresh in my mind anymore." Upon review of his statement, he recalled that when Thompson and Cornish approached Sims, Thompson asked, " 'Is that him?' " and Cornish answered: "Yes, that's him, that's the one."

Montcreal Huggins testified that she and Sims "were friends" in 2007, but appellant had been her boyfriend in 2005. She indicated that on the evening of June 30, 2007, she was at her residence at the corner of Lloyd and Granby Street, "outside standing on the porch" with her brother, Brent; her cousin; and her cousin's friends. She saw Sims ride "on his bike," "past [her] house." He then "came over and he asked [her] how [she] was doing and [they] continued to have a conversation." She explained that, "[i]n the middle of the conversation Apollo [Thompson] and Paul [Cornish] came around the corner and then . . . they stopped in front of [Sims] and they—basically it was a problem." Ms. Huggins stated: "I don't know what the situation was but it was conflict." She continued: "[T]hey walked up to him and . . . well, Mr. Thompson said, 'Is this the nigger right here?' He stated that to Paul." At the time, Ms. Huggins was about three or four feet away from Sims. Ms. Huggins testified that Cornish and Thompson "continued to get closer and as they got closer . . . [Sims] lifted up his shirt." At that time, Ms. Huggins saw a "gun." She claimed that Cornish and Thompson "didn't do anything. They just still stood there." Sims "warned them that he had a gun because Mr. Thomas [sic] . . . had a weapon also." According to Ms. Huggins, Thompson was carrying a knife "[o]n his hip."

Ms. Huggins recalled that Thompson and Cornish were within "arm's reach" of Sims, and she was about "four or five feet" from Sims when he "pulled out the gun." Cornish and Thompson then "ran off," with "[t]heir back . . . towards [Sims] as they ran away." She "was going into [her house]." While inside, she heard two gun shots. However, she said: "I didn't see him shoot the gun."

About an hour after the shooting, appellant called Ms. Huggins and apologized for "put[ting] [her] in harm's way."[6] Ms. Huggins indicated that "the defendant told [her] that a friend of his . . . was shot" on June 29, 2007. When asked if the person's name was "Tim," Ms. Huggins replied that she didn't "recall names." The following exchange ensued:

[PROSECUTOR]: Okay. What area did the defendant tell you that the people who did something to Tim lived in?

[MS. HUGGINS]: My neighborhood.

[PROSECUTOR]: All right and just so the record is clear, this conversation that you're having with the defendant regarding Tim, is that after the shooting of Mr. Cornish?

[MS. HUGGINS]: Yes.

[PROSECUTOR]: Okay. . . . In that same conversation with the defendant where he discussed something happening to his friend Tim . . . does the defendant explain to you why it is he came back down to Lloyd Street on the day of Mr. Cornish's shooting?

\* \* \*

[MS. HUGGINS]: Yes. \* \* \* He said that someone from our neighborhood had robbed and shot his friend and he was just coming down here to solve a problem. \* \* \* He didn't come down here to fight.

Later that night, Ms. Huggins was interviewed by Detective Diaz and another detective at the police station. She stated that she "didn't tell them that [she] knew who did the shooting. [She] didn't tell them anything." Additionally, she agreed that she did not tell police that Mr. Thompson had a knife. But, she told Detective Diaz and his partner that the person who fired the shots "was on a bike" and "had a hat on," although she did not "remember seeing his face." She explained that she did not initially tell the police that Sims was the shooter because she "did not want to be involved" and that she was "protecting [her]self." However, Ms. Huggins later

---

6. Phone records were admitted in evidence that corroborated that appellant had called Ms. Huggins.

acknowledged that, during her first police interview, she told police that she "saw the flash or the flare of the gun" as it was fired.

According to Ms. Huggins, on July 9, 2007, "Officer Diaz and his partner" came to her house and told her "that they needed [her] down at the station." She claimed that Officer Diaz's partner began to "threaten" her when he was in her home and then again at the police station. According to Ms. Huggins, "he told me that if I—he asked me did I like my neighborhood and he told me that if I liked where I live, he should—I should tell the truth because if I didn't, he would get me and my family put out." Ms. Huggins agreed that the detective also told her "she could be charged with a crime." After that threat, she identified appellant as the man she had seen on the bicycle with the gun.[7]

The court asked Ms. Huggins: "As a result of these threats you gave a statement?" Ms. Huggins answered, "Yes." The court then asked: "Was your statement truthful or did you lie?" Ms. Huggins replied: "No, I did not lie. I told them exactly what I saw." Ms. Huggins later acknowledged that she lied during her first interview, when she claimed she did not know the identity of the shooter. She stated: "[I]t was a lie because I did know who he was."

Ms. Huggins was shown a photo array during the second interview; she identified Sims as the shooter. On the back of the photo array, Ms. Huggins wrote: "[P]erry is my ex-Boyfriend. [P]erry shot Paul."

Detective Diaz testified that appellant was arrested on July 13, 2007, was advised of his rights, waived them,[8] and made a recorded statement. It was played for the jury. In that

---

7. Baltimore City Police Detective Vernon Parker testified that he accompanied Detective Diaz to Ms. Huggins's home on July 9, 2007. He denied making any threats to Ms. Huggins. Detective Diaz also denied making any threats to Ms. Huggins.

8. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

statement, appellant claimed that, on the date of the crime, he was at his mother's home all day until he "went up Douglas projects" at about 11:00 p.m. Appellant also claimed that, between 9:00 p.m. and 11:00 p.m., his mother blew out and braided his hair, and that his younger and older brothers were also at the house. In addition, Sims indicated that someone named Tim, who "live up the street" from appellant, had been shot that day.[9] Appellant denied that he owned a bicycle. He also denied that he shot anyone.

The State sought to play three recorded telephone conversations involving appellant, which took place during appellant's pretrial incarceration.[10] In connection with the ruling on the admissibility of the recorded telephone conversations, the court also discussed the defense's alibi notice.

The prosecutor advised the court that the defense had disclosed a list of "about 10" alibi witnesses, and that, in one of the recorded telephone conversations, appellant referred to about twenty people who saw him at a party. Referring to the alibi notice, the court asked: "Are you going to put that into evidence?" The court then said: "[I]f the alibi statement sounds to be probative, she's [i.e., defense counsel] the agent of the defendant, so it's admissible against him. . . ." The court also said to the prosecutor: "[Y]ou should put the filing into evidence so that you can argue it to the jury." The following ensued:

---

9. As noted, the statement was played for the jury. The court transcription refers to this person as "Tina." But, the transcript prepared by the police identified the person as "Tim." In addition, Detective Anthony Kreafle testified that at 1:08 a.m. on June 30, 2007, Timothy Spearman was shot "in the, the right thumb. . . ." The incident took place a few blocks from Lloyd and Granby streets.

10. Sergeant Monique Mitchell, the custodian of records for the Baltimore City Detention Center, testified that when an inmate makes an outgoing call, both the inmate and the call recipient hear a recording that says that " 'this call is from a correctional institution and is subject to monitoring and recording.' " The jury was provided with transcripts of the conversations.

[APPELLANT'S COUNSEL]: Your Honor, I would have an objection to that and ask for an opportunity to be heard—

THE COURT: You'll be heard.

[APPELLANT'S COUNSEL]:—on that collateral issue.

THE COURT: All right. But if—well, why don't you tell me now. Why shouldn't your alibi statement—you're the agent of the defendant, why wouldn't that come in?

[APPELLANT'S COUNSEL]: Your Honor, the Defense has no burden to put any defense on. And the State bringing up the Defense's attorney filing a notice of alibi witnesses, shifts the burden that my client then has to rebut.

\* \* \*

THE COURT: Let me put on my Defense attorney hat for a minute. \* \* \* She's not bound to put on an alibi defense. \* \* \* She [i.e., the defense] just has to give you warning. \* \* \* And suppose she as a careful lawyer says, all right, I better file [the alibi notice] this so I have the option of using it and decides not to do it. Then what's the relevance for the State to put it in?

[PROSECUTOR]: The relevance for the State, whether she puts it in or not, is consciousness of guilt. The State's argument—

THE COURT: It could be. But how does that show consciousness of guilt? It's only consciousness of guilt if it's false. \* \* \* The fact that she doesn't use it doesn't mean it's false. \* \* \* The fact that she's not—how do you prove it's a false alibi. \* \* \* At least it is an admission by counsel. \* \* \* I mean counsel could say and the defendant could say, you know, I've got these alibi witnesses, but maybe they've got criminal records, maybe the jury won't like them, so I'm going to make a tactical decision not to put them on. And making that tactical decision should not bite them frankly. I only think it comes in if it's clear the defendant knows that he's lying.

\* \* \*

[PROSECUTOR]: Right. What I'm saying is they are putting forth alibi witnesses saying that they were at this party—

THE COURT: Was there a party to your knowledge?

[PROSECUTOR]: Okay, well, I can't say that—

THE COURT: You don't know.

[PROSECUTOR]: ... There may have been a party. I believe that there might have been—

\* \* \*

THE COURT: What else you've got that shows that he knows that it's a false alibi?

[PROSECUTOR]: All right. On the alibi, and this is during the time that the defendant is on the telephone calls, he's speaking again to his mother, and then one time also to his father. And in one conversation with his mother, he's discussing with his mother that they have alibi witnesses, and that the defendant was at his mother's house because the father and the little brother went out of town. . . . That's why he came over for his mother's birthday party.

\* \* \*

THE COURT: How do you show it's [i.e., the alibi notice] false and that he knows it's false?

[PROSECUTOR]: By his response to the statement, by the fact that he speaks to his father, by the fact that they say he's in Myrtle Beach on the phone call.[11]

\* \* \*

THE COURT: Okay, you're telling me there's a phone call in which the defendant says father and brother were out of town?

[PROSECUTOR]: Town, right. He's talking to the mother.

---

**11.** We were unable to find any reference to Myrtle Beach in the transcripts of the recorded phone calls, or any call between appellant and his father. However, Detective Diaz indicated that there were multiple telephone calls; only three were played for the jury.

THE COURT: And he says they were out of town, and then he lists those two as alibi witnesses. * * *—why it matters is your proffer that there is a subsequent phone call in which he says where he's going to use two people as alibi witnesses, father and brother I think you said. And did in fact list those two people he knows were not there. Based on that proffer, if I understood you correctly, that there is a subsequent phone conversation in which he says in effect we'll use father and brother I think that subsequently helps to pull this one in. * * * So let me hear from [appellant's counsel]. What do you want to tell us?

\* \* \*

[APPELLANT'S COUNSEL]: * * * The speaker who's not institutionalized [i.e., appellant's mother] says "because you came home, because you're staying with your father, and your father then went out of town, your father and your little brother. That's why you was over here with me." * * * But where it indicates that the father and the little brother were out of town. I mean where's the impeachment portion of that? . . . .

THE COURT: Okay. I hear you, but I think it's enough to let it in.

The telephone recording that the State played first was of a conversation between appellant and his mother on July 31, 2007. The following excerpt is relevant (emphasis added):

[APPELLANT]: . . . Ma' [sic] I just need everybody, Ma', that you can get Ma', (unintelligible)

[APPELLANT'S MOTHER]: Uh huh.

[APPELLANT]: And vouch for me and say the same shit, see what I'm saying?

[APPELLANT'S MOTHER]: Yeah I know.

[APPELLANT]: I told them that you know my hair was all over my head, you done my hair.

[APPELLANT'S MOTHER]: Uh huh.

[APPELLANT]: You see what I'm saying from at um what—you start doing my hair like seven o'clock but the

party started at six. I been there ever since that morning. You feel me?

[APPELLANT'S MOTHER]: Yeah.

[APPELLANT]: (inaudible) you already know.

[APPELLANT'S MOTHER]: Because you came home, because *you was staying with your father and your father and them went out of town*—your father and your little brother—*that [sic] why you was over here with me.*

[APPELLANT]: Okay. Right.

[APPELLANT'S MOTHER]: On my birthday that's the way it went.

[APPELLANT]: Uh huh. That's what I'm saying right, and all, and everybody Aunt Lisa everybody you see what I'm saying?

[APPELLANT'S MOTHER]: Uh huh.

[APPELLANT]: See what I'm saying—vouch for me—everybody that was at that party.

[APPELLANT'S MOTHER]: Yeah.

[APPELLANT]: As long as I have at least about seven people, I'm good Ma' [sic] I know you can get that, you hear me?

[APPELLANT'S MOTHER]: I know baby and I know.

The State next played a telephone conversation between appellant and his mother on July 15, 2007. Appellant told his mother that "they saying I supposed to did that at 10:10." He also said that at "10:10 Ma and I ain't leave, I ain't leave outside really about up Douglas until like 11 o'clock any mu [sic], any way, you see what I'm saying. You did my hair and everything, my hair was all over my head, come on now, Ma."

The third recording concerned a telephone conversation between appellant and Tim on July 18, 2007. Appellant stated:

Right—So they—man—they ain't got nothing on me, man, they ain't got nothing, man. All it is, somebody, somebody snitching on me, though, (unintelligible). One of them niggahs got mad and start (unintelligible). (Unintelligible)

when I get my motions and all that, you feel me? \* \* \*
Right, right, right, right. Somebody ratting hard, you hear
me, something terrible. Some nigga.

During the phone call, Tim indicated that he was with a
"couple" of other people, and appellant asked Tim to put one
of those persons on the phone. Appellant told that individual:

I got alibis and everything, saying I was at the house the
whole time, feel me, this and that.

\* \* \*

Yo, you know the whole time, the thing was suppose [sic] to
went down my mother birthday, you hear me, so where as
though I gotta like 20, 25 people already signed papers and
everything saying I was in the house whole time, man. You
feel me?

The State showed Detective Diaz State's Exhibit No. 30,
which was a redacted version of the alibi notice that appel-
lant's attorney had submitted on February 5, 2008. As noted,
the alibi notice initially contained the names of eleven alibi
witnesses. The redacted version contained only the name of
appellant's father, and was in the form of a pleading, signed
by appellant's attorney. Captioned "NOTICE OF ALIBI
WITNESS," it stated: "Pursuant to Maryland Rules of Proce-
dure, 4–263(d)(3), Defendant is disclosing the name and ad-
dress of the following witness:" The Notice listed "Perry
Simms, Sr." along with his address.

The following testimony is pertinent:

[PROSECUTOR]: During the investigation and approach-
ing the trial date in this case, did there come a time that you
received any documentation relating to Notice of an Alibi
Witness on behalf of the defendant?

[DETECTIVE DIAZ]: Yes ma'am.

[PROSECUTOR]: When you received the document that
I'm showing you, State's 30, does that document—what it
that—what is the name on State's 30 that was disclosed on
behalf of the defendant as an alibi witness?

[APPELLANT'S COUNSEL]: Objection, Your Honor.

THE COURT: Basis.

Defense counsel sought to incorporate her earlier arguments. At the bench, the following occurred:

[APPELLANT'S COUNSEL]: Okay. Your Honor, my objection is that the document [i.e., the redacted alibi notice], in and of itself, is tantamount to a pleading. . . . * * * It's not evidence in this case.

\* \* \*

THE COURT: Pleadings can be if there are admissions.

[APPELLANT'S COUNSEL]: But they're—it's prepared by counsel, it's not. . . .

THE COURT: It's an agent of a defendant.

[APPELLANT'S COUNSEL]: That's correct and I just want it placed on the record so the Court knows. As I indicated previously, Mr. Sims was represented by another attorney. I picked up his case after [appellant] had been charged, had his indictment, had been arraigned. I did not enter my appearance in this case until January and as his attorney I felt duty bound to turn over whatever information I had.

THE COURT: Understood.

[APPELLANT'S COUNSEL]: And it's not necessarily proper to assume the information I had came from the defendant and entering this Notice of Alibi Witness into evidence, I believe creates that aura that it came from him.

THE COURT: On a personal level, I'm sympathetic . . . . but I, as I understand the law, an emaciate [sic] pleading can be an admission and when you enter into a pleading on his behalf, it is—can be an admission against him. The record should reflect that Exhibit 30 has been redacted so that only one name of the, I don't know, dozen that you submitted, is going to the jury and the reason and that one name is Perry Simms, Senior—. * * * [A]nd the only reason I'm letting it in is because of the taped conversation which he says his father was out of town. I would not let in

other names for all kinds of reasons so your objection's noted, appreciated, overruled.

The testimony resumed, as follows:

[PROSECUTOR]: [W]hose name was provided as an alibi witness on behalf of the defendant?

[DETECTIVE DIAZ]: I received Senior, Perry Simms, Senior.

The State then offered State's Exhibit 30 into evidence. Appellant again objected, the court again overruled the objection, and the redacted alibi notice was admitted.

After the prosecution rested,[12] appellant rested. He did not testify or call any defense witnesses.

The court and counsel discussed jury instructions, initially in chambers and then on the record.[13] In terms of argument as to the issue of alibi witnesses, the court limited the State to arguing only about appellant's mother and father.[14]

Immediately before giving "formal instructions on the law," the court announced to the jury a "preliminary instruction on the evidence." It said:

> Ladies and gentlemen, there was some tapes played for you recently during the trial. And there was some references there to potential alibi witnesses, and I want to tell you to strike from your mind any references about alibi witnesses except as the testimony concerned the defendant's father and mother. Other than father and mother, you should strike it from the record and do not consider it.

In closing, defense counsel argued, in part:

---

12. The State called five additional witnesses, none of whose testimony is material to the issues before us.

13. Appellant's counsel unsuccessfully moved for a mistrial, apparently based on the alibi issue.

14. The court also determined to excise references to other witnesses in the tapes of the recorded telephone conversations, in the event that the jury requested the tapes.

Mr. Simms gave a statement to Detective Diaz, and he told him I wasn't there. Not self defense. I had a gun, you had a gun, there are witnesses, weapons, two of them, one of me. He never said it was self defense. He said I wasn't there. It wasn't me. Were you listening? It has nothing to do with self defense.

In rebuttal, the State argued:

Defense tells you [Ms. Huggins is my witness]. Please understand that just because I called somebody to the stand, that don't make them my witness. Please understand it's my burden to prove a case, so I'll get the witness here, but that doesn't make them my witness, okay? Montreal [sic] Huggins wasn't my witness. She was his witness. His witness, his girl. What does she say? I was threatened. I was threatened. Counsel tells you that when she went downtown that first night, she said she didn't know who did the shooting. You know why she said she didn't know who did the shooting? Because that's your witness. I'm not saying he has any burden to prove anything. The burden is all mine. I got that. But I'm trying to get you to understand about the motive with which people come to court. And just because I put her on the stand, doesn't mean that they have any (indiscernible) to me, to my cause.[15]

We shall include additional facts in our discussion.

## DISCUSSION

### A.

■ Appellant argues that he "is entitled to a new trial because the trial judge erroneously permitted the prosecution to introduce his pretrial alibi notice." He posits that no state in the country permits the prosecution to "introduce an alibi

---

15. Neither the State nor the defense discussed the issue of alibi in closing. Moreover, the court did not propound a jury instruction as to an alibi witness.

statement against a non-testifying defendant who calls no witnesses." Sims asserts:

[I]ntroducing an alibi notice against a non-testifying defendant who calls no witnesses impermissibly converts a rule of discovery into a method for extracting admissions, invites the jury to draw a negative inference from the defendant's decision not to present a case, and calcifies the defendant's trial strategy before he has the benefit of seeing the prosecution's evidence.

The State responds: "While [Sims] did not testify or call witnesses, his defense was essentially an alibi defense." It maintains that the alibi notice was properly admitted because "Sims's defense at trial was that he was elsewhere at the time of the offense." [16] In addition, the State posits that the authorities suggesting that it is improper to introduce an alibi notice that has been "withdrawn" are not apposite, because Sims does not claim that he withdrew his alibi notice.

Further, the State contends that the redacted alibi notice was "relevant to a willfully false alibi." It argues:

The taped phone calls gave the trial court a sufficient basis for concluding that the alibi as to his father was willfully false. Thus, the redacted alibi notice was properly admitted because Sims essentially presented an alibi defense and other evidence tended to show that, as to one name on the alibi notice, it was willfully false.

We conclude that the circuit court erred or abused its discretion by permitting the State to introduce into evidence appellant's pretrial alibi notice, when appellant neither testified nor presented a defense case. We explain.

■■■■ An alibi is " '[a] defense that places the defendant at the relevant time of [the] crime in a different place than the scene involved....' " *Robertson v. State,* 112 Md.App. 366,

---

**16.** The State recognizes that its claim of an " 'elsewhere' defense" was based on its use of appellant's pretrial statement to the police, the recorded phone conversations, as well as the closing argument of defense counsel, who "argued that Sims was elsewhere."

375, 685 A.2d 805 (1996) (citation omitted). *See Smith v. State*, 302 Md. 175, 180, 486 A.2d 196 (1985). As one criminal scholar explains: "The presence of the defendant at the scene of the crime at the time it was committed is obviously an essential element of the prosecutor's case[.]" CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 27, at 273 (15th ed. 1993). When a defendant raises an alibi defense, "he is in effect denying the claim of the prosecution that he was present at the scene of the crime at the time it was committed." *Id.* at 274. By claiming "that he was at another place at the time when the alleged crime was committed, the defendant is denying by necessary implication, if not expressly, the allegations set forth in the charge." *Id.*

 To prove an alibi, "the testimony must cover the whole time in which the crime ... might have been committed." *Floyd v. State*, 205 Md. 573, 581, 109 A.2d 729 (1954). However, an alibi defense is not an affirmative defense. *Robertson*, 112 Md.App. at 375, 685 A.2d 805. Rather, it merely serves "to negate an element of the crime," i.e., criminal agency. *Id.* Consequently, the defendant does not bear the burden of proof on that issue. *See In re Parris W.*, 363 Md. 717, 728, 770 A.2d 202 (2001) ("An alibi is not an affirmative defense, and a defendant does not bear the burden of proving that he or she was elsewhere during the commission of the crime."); *Robinson v. State*, 20 Md.App. 450, 459, 316 A.2d 268 (1974) ("Proof of an alibi, like any other defense testimony, is simply a means of controverting the State's effort to establish criminal agency."). *See also State v. Grady*, 276 Md. 178, 184, 345 A.2d 436 (1975).

To be sure, a defendant "traditionally has not [been] required ... to plead specifically his defense. A plea of 'not guilty' ordinarily brings into issue all possible defenses to the substantive charge." WAYNE R. LAFAVE, ET AL, CRIMINAL PROCEDURE § 20.5(b) (5th ed. 2009) ("LAFAVE"). However, "the federal system and more than forty states require the defendant to give advance notice of his intent to raise an alibi defense." *Id.* Maryland is one of those states. *See Williams*

*v. Florida,* 399 U.S. 78, 83, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) ("[T]he privilege against self-incrimination is not violated by a requirement that the defendant give notice of an alibi defense and disclose his alibi witnesses.").

At the relevant time, disclosure of an alibi notice was governed by Maryland Rule 4–263(d)(3).[17] Rule 4–263 is captioned "Discovery in circuit court." Subsection (d) was captioned "Discovery by the State," and pertained to the defendant's discovery obligations. Rule 4–263(d)(3) provided:

(d) **Discovery by the State.** Upon the request of the State, the defendant shall:

\* \* \*

(3) Alibi witnesses. Upon designation by the State of the time, place, and date of the alleged occurrence, furnish the name and address of each person other than the defendant whom the defendant intends to call as a witness to show that the defendant was not present at the time, place, and date designated by the State in its request.

In addition, under Maryland Rule 4–263(e), appellant was required to "furnish the discovery within ten days after service." As noted, appellant's attorney furnished the alibi notice soon after she entered her appearance in the case, some six months before the trial.

The Court of Appeals elucidated the reasons for the required alibi notice in *Taliaferro v. State,* 295 Md. 376, 385–86, 456 A.2d 29 (1983), *cert. denied,* 461 U.S. 948, 103 S.Ct. 2114, 77 L.Ed.2d 1307 (1983):

The reasons underlying a procedure that requires notice of an alibi defense are well stated in Epstein, *Advance Notice of Alibi,* 55 J.Crim. L., Criminology & Police Sci. 29, 31–32 (1964):

"*One.* Foremost is the idea that the statute prevents surprise. Alibi has been termed a 'hip pocket' defense

---

**17.** As noted, the alibi notice requirement is now codified in Rule 4–263(e)(4).

because of the ease with which it can be manufactured for introduction in the final hours of trial.

*Two.* The statute acts to deter false alibis because defendants know that the information furnished will be investigated before trial....

....

*Three.* Pretrial investigation results in a saving of money and trial time. This occurs in two ways. (1) If, after the investigation, the district attorney is satisfied that the alibi is true, the case should be dismissed; (2) the district attorney is not surprised at trial by the alibi defense, and there is no need for a continuance to investigate and prepare....

....

*Four.* Alibis which are presented at trial will be accorded more respect...."

Rule 12.1(f) of the Federal Rules of Criminal Procedure expressly bars the admission of an alibi notice against the person who provided the notice. It states: "Evidence of an intention to rely on an alibi defense, later withdrawn, or of a statement made in connection with that intention, is not, in any civil or criminal proceeding, admissible against the person who gave notice of the intention." As one court has said in regard to D.C.Super. Ct.Crim. R. 12.1(f), which was modeled upon Fed.R.Crim.P. 12.1(f):

Rule 12.1(f) apparently reflects the concern that the defendant not be harmed by this exception to the general concept that a defendant need not commit his or her defense to a particular course until the government has presented its entire case, so that the defense in no way aids the prosecution in its presentation. If the defendant could not freely withdraw an alibi defense, "the deprivation of flexibility, with the result that the defendant is forced to answer the government's case before it is presented, could be constitutionally suspect under traditional concepts of due process."

*McKoy v. United States,* 518 A.2d 1013, 1018–19 (D.C.1986) (citation omitted), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1081, 99 L.Ed.2d 240 (1988).

Like the federal courts, many states have rules of procedure that expressly bar use at trial of an alibi notice.[18] But, Maryland Rule 4–263(d)(3) (now Md. Rule 4–263(e)(4)) is silent as to the use of an alibi notice at trial. Moreover, we did not uncover any reported Maryland appellate decision that speaks to the precise issue presented here. Accordingly, we have looked for guidance from other jurisdictions that have addressed this issue.

Many of our sister jurisdictions bar the prosecution's use of an alibi notice at trial when the defendant does not testify or present evidence. *See, e.g., People v. Hampton,* 696 P.2d 765, 777 (Colo.1985) ("If [the defendant] elects to give notice and subsequently decides not to offer alibi evidence at trial, the notice of alibi may not be the subject of examination or comment at trial."); *People v. Holland,* 179 Mich.App. 184, 445 N.W.2d 206, 209–10 (1989) (noting that, "prior to defendant's actually presenting an alibi at trial, the prosecution and trial court may not comment on the defendant's filing of an alibi notice or the failure to produce corroborating witnesses," but concluding that the court did not err in allowing the prosecution to introduce the alibi notice after the defendant testified to an alibi without calling the two persons identified in the alibi notice), *appeal denied,* 434 Mich. 888 (1990); *People v. Shannon,* 88 Mich.App. 138, 276 N.W.2d 546, 548–49 (1979) (finding that trial court erred by allowing prosecution to notify jury about defendant's alibi disclosure where defendant did not testify or call the alibi witness); *State v. Curby,* 553 S.W.2d 566, 569 (Mo.Ct.App.1977) (finding reversible error because prosecution alerted jury to alibi disclosure during opening statement although defendant did not put on alibi

---

**18.** *See, e.g.,* Conn. Gen. Prac. Book, R.Super. Ct. § 40–25; Ga.Code Ann. § 15–11–75; La.Code Crim. Proc. Ann. Art. 27(f); Mass. R.Crim. P. 14(b)(1)(f); N.M. R.Crim. P. 5–508(e); N.D. R.Crim. P. 12.1(f); S.D. Codified Laws § 23A–9–6; Vt. R.Crim. P. 12.1(f).; W. Va. R. Cr. P. 12.1(f); Wis. Stat. § 971.23; Wyo. R. Cr. P. 12.1(f).

defense); *State v. Lumumba*, 253 N.J.Super. 375, 601 A.2d 1178, 1190 (App.Div.1992) ("[W]here a defendant does not testify, reference cannot be made to an alibi notice...."); *People v. Rodriguez*, 3 N.Y.3d 462, 787 N.Y.S.2d 697, 821 N.E.2d 122, 125–26 (2004) (concluding that trial court erred in permitting prosecutor to use alibi notice to impeach defense witnesses); *Jackson v. State*, 808 P.2d 700, 701 (Okla.Crim. App.1991) (finding that it was error for the trial court to allow the prosecutor to impeach a defendant with a notice of alibi where the defendant never asserted an alibi defense); *State v. Cocco*, 73 Ohio App. 182, 55 N.E.2d 430, 432 (1943) (stating that "[u]nder no conceivable theory" should the trial court have allowed the prosecution to introduce an alibi notice "when there had been no evidence of an alibi ...."), *appeal dismissed*, 142 Ohio St. 276, 51 N.E.2d 723 (1943); *State ex rel. Simos v. Burke*, 41 Wis.2d 129, 163 N.W.2d 177, 180 (1968) ("The defendant ... retains full freedom of choice to give notice of alibi.... If he elects to do so and subsequently does not put the alibi into issue at the time of trial, the notice of alibi is not to be commented on at the time of trial.") [19]; *cf. People v. McFarland*, 93 Ill.App.3d 136, 48 Ill.Dec. 496, 416 N.E.2d 769, 775 (1981) ("We conclude that the theories of defense disclosed in response to discovery are not admissions of the defendant and inappropriately considered as affecting the defendant's credibility.").

We recognize that some jurisdictions that generally bar use of an alibi notice against a defendant may permit use of an alibi notice to impeach a defendant who testifies inconsistent with an alibi notice. *See, e.g., Holderfield v. State*, 578 N.E.2d 661, 663 (Ind.1991) ("In view of [the alibi] testimony presented by appellant in his defense, it was proper for the State to present both of appellant's alibi notices to show their contradictory nature and to attack the credibility of [the alibi witness's] testimony."); *People v. McCray*, 245 Mich.App. 631, 630 N.W.2d 633, 637 (2001) ("[A]s a party-opponent admission,

---

**19.** Wisconsin subsequently adopted a rule governing the use of an alibi notice.

the notice of alibi may be used to impeach defendant's credibility at trial when his testimony is inconsistent with the contents of the alibi notice."), *appeal denied,* 466 Mich. 873, 645 N.W.2d 666 (2002); *Thomas v. Commonwealth,* 24 Va. App. 614, 484 S.E.2d 607, 609 (1997) ("Defendant in this instance was responsible for the content of his alibi notices, testified differently, and had the opportunity to explain on either cross or redirect examination the inconsistencies in his several statements.... [W]e cannot conclude that the trial court abused its discretion in allowing the Commonwealth to use the notices for purposes of impeachment."). *See also* LAFAVE, *supra,* § 20.5(b) ("Courts have held ... that the notice of alibi can be used to impeach a defendant who testified as to an alibi defense inconsistent with that contained in the notice of alibi.... A few cases have suggested that prosecutors may use a withdrawn alibi notice to impeach a defendant who takes any inconsistent position in his trial testimony.").

The cases cited above are distinguishable from the case *sub judice,* however, because appellant never testified. As appellant puts it, the "debate" concerning use of an alibi notice for impeachment "is not implicated" here, because appellant neither testified nor called any witnesses.

It is noteworthy that Maryland's alibi notice provision is included in the rules governing discovery. As we have seen, the defense is required, by rule, to provide notice of an alibi, before trial. Failure to do so may result in the waiver of the right to call an alibi witness. *Cf. Muhammad v. State,* 177 Md.App. 188, 288, 934 A.2d 1059 (2007) (concluding that the trial court did not abuse its discretion in preventing defendant's witness from testifying because of the defendant's belated disclosure of the witness), *cert. denied,* 403 Md. 614, 943 A.2d 1245 (2008). Barring the right to call a witness is one thing; allowing the State to use an alibi notice against the defendant is another matter. We agree with appellant that "introducing an alibi notice against a non-testifying defendant

who calls no witnesses impermissibly converts a discovery tool into a means of extracting admissions" from a defendant.

As one legal scholar observes, "The purpose of discovery is to permit preparation by the state, not to lock the defendant into a specific defense." ROBERT P. MOSTELLER, *Discovery Against the Defense: Tilting the Adversarial Balance*, 74 CAL. L.REV. 1567, 1650 (1986) ("Mosteller").[20] To be sure, the pretrial alibi notice enables the State to investigate the information disclosed by the defense, while also deterring a fabricated, eleventh hour defense. *See Taliaferro*, 295 Md. at 385–86, 456 A.2d 29. However, the purpose of Rule 4–263, which is a discovery rule, is not served by allowing the State to introduce an alibi notice at trial against a defendant who does not testify or present a defense case.

If we were to adopt the State's view, the defense, in effect, would be forced to decide, before trial, whether to proceed with an alibi defense; if the defense initially elected to present an alibi defense, the State's position would mean that the defense would run the risk of adverse consequences if it later sought to change its trial strategy. In our view, this would jeopardize the hallowed principle that a defendant has no burden to prove his innocence. *See Brogden v. State*, 384 Md. 631, 649, 866 A.2d 129 (2005) ("[P]etitioner did not put on any evidence at trial in his defense—he merely relied on a presumption of innocence, which he unquestionably is entitled to

---

**20.** Both appellant and the State rely extensively on Mosteller. According to the State, Mosteller argues that " 'neither the fifth amendment nor the theory upon which prosecutorial discovery is based justifies impeachment except when the state is prejudiced in its ability to investigate an altered defense, **or when either the discovery disclosure or the trial testimony is willfully false.**' " *Mosteller*, at 1649–50. (Emphasis in State's brief). The State relies on this point to assert that it was proper for the trial court to admit the redacted alibi notice "because the evidence showed that, as to the listing of Sims's father, the notice was willfully false." But, Mosteller begins his discussion by indicating that "a number of states permit discovery disclosures to be used to impeach the defendant when *his trial testimony* is inconsistent with his pretrial notice." *Id.* at 1649–50 (Emphasis added). Here, as we discussed, Sims did not testify. Therefore, the State's reliance on Mosteller is misplaced.

do."). Such a position would also infringe upon a defendant's constitutional and statutory rights to remain silent. *See* Article 22 of the Maryland Declaration of Rights ("That no man ought to be compelled to give evidence against himself in a criminal case."); the Fifth Amendment to the United States Constitution ("No person . . . shall be compelled in any criminal case to be a witness against himself."); Md.Code (2006 Repl.Vol.), § 9–107 of the Courts and Judicial Proceedings Article ("C.J.") ("A person may not be compelled to testify in violation of his privilege against self-incrimination. The failure of a defendant to testify in a criminal proceeding on this basis does not create any presumption against him.").

 Clearly, a defendant is entitled to make a last minute decision not to testify or put on a defense case. This would necessarily include the right to abandon an alibi defense, without the risk of the State's use of the alibi notice against the defendant. *Cf. Marshall v. State*, 415 Md. 248, 261–62, 999 A.2d 1029 (2010) (concluding that State's rebuttal argument violated defendant's right not to testify at trial).

As we have seen, the trial court suggested that alibi notices are admissible pleadings, "if there are admissions" [21] contained within them. We disagree. *Shannon, supra,* 88 Mich.App. 138, 276 N.W.2d 546, provides guidance.

In *Shannon,* the prosecution argued that the defendant's alibi notice was admissible because it was a pleading that "may be introduced into evidence as part of the 'public records' exception to the hearsay rule." *Id.* at 548. But, the court explained: "Assuming, *arguendo,* the validity of this contention, it would only permit the lower court's action to survive an attack based upon hearsay and does not reach the issue of whether defendant is unfairly prejudiced by such practice." *Id.* The court continued: "There are numerous

---

**21.** The State quotes from 1 Edward J. Imwinkelried et al., *Courtroom Criminal Evidence* § 1718, at 759 (2005), stating that some "jurisdictions treat any information received [in an alibi notice] as a fully admissible admission." But, Imwinkelried does not provide any support for his assertion.

motions, pleadings and briefs in a court file that may be public record, but would not be admissible at trial because of their prejudicial impact." *Id.* In a footnote, the court added: "For example, motions to suppress illegally obtained evidence or to limit the permissible scope of impeachment, although part of the court record, are never admissible at trial because of their prejudicial nature." *Id.* n. 2.

As we have seen, the State vigorously urges that the redacted alibi notice was admissible to show that Mr. Sims willfully concocted a false alibi. Yet, even if such a basis might support admission of an alibi notice in some circumstances, the State's theory of falsity was not clear from the evidence. We elaborate.

The prosecution relied on a phone call between appellant and his mother to support its claim that the alibi notice was false. There, appellant's mother reminded appellant that "your father went out of town . . . and that's why you was over here with me." Both the State and the court were of the view that, if appellant's father was out of town, the alibi notice suggested that appellant falsely identified his father as an alibi witness. Yet, they overlook that evidence that Mr. Sims's father was out of town arguably *supported* appellant's alibi. Appellant contended that he was at his mother's house at the relevant time because his father was out of town, and thus he could not stay at his father's residence. Accordingly, appellant's identification of his father as an alibi witness was not inconsistent with his pretrial claim that he was not at the scene of the shooting.

We also reject the State's contention that it was entitled to use the alibi notice because Sims is the one who "essentially" put forth an alibi defense, notwithstanding his failure to present a defense case. In this regard, the State relies on Sims's pretrial, custodial statement to the police that he was at his mother's home at the time of the shooting; the recorded phone conversations involving appellant, made while he was incarcerated; and defense counsel's closing argument.

 Ordinarily "someone else must provide a defendant with an alibi." *Schmitt v. State,* 140 Md.App. 1, 28, 779 A.2d 1004 (2001), *cert. denied,* 367 Md. 88, 785 A.2d 1291 (2001). But, in the context of a defendant's request for an alibi jury instruction, the defendant's uncorroborated testimony that he was elsewhere at the time of the crime is ordinarily sufficient to generate the issue of an alibi and justify an alibi jury instruction.[22] *Smith,* 302 Md. at 180–81, 486 A.2d 196; *Schmitt,* 140 Md.App. at 27, 779 A.2d 1004; *Pulley v. State,* 38 Md.App. 682, 688–91, 382 A.2d 621 (1978). Writing for this Court in *Robertson,* 112 Md.App. at 382, 685 A.2d 805, Judge Harrell said: "[T]he fact that an alibi defense is not an affirmative defense lends further support to the notion that the defendant, himself, need not introduce alibi evidence in order to generate the basis for an instruction on the issue." *Robertson* established that, even if a defendant does not testify or call an alibi witness, a defendant may rely on exculpatory testimony adduced from a prosecution witness, including a police officer to whom the defendant made a pretrial statement, to establish an alibi and then request an alibi jury instruction. *Id.* at 378–79, 685 A.2d 805. *See United States v. Hairston,* 64 F.3d 491, 494–95 (9th Cir.1995); *United States v. Webster,* 769 F.2d 487, 490 (8th Cir.1985); *United States v. Hicks,* 748 F.2d 854, 857 (4th Cir.1984); *see also Plemons v. Georgia,* 194 Ga.App. 554, 390 S.E.2d 916, 918 (1990).

In this case, however, appellant did not pursue an alibi defense nor request an alibi jury instruction. In effect, the State's argument is tantamount to bootstrapping. It relies on evidence it introduced against appellant to establish its claim that appellant had an alibi defense, and it then argued that it

---

**22.** Maryland Criminal Pattern Jury Instruction 5:00 provides the following alibi instruction:

> Evidence has been introduced that the defendant was not there when the crime was committed. You should consider this evidence along with all other evidence in this case. Thus, in order to convict the defendant, the State must prove, beyond a reasonable doubt, that the crime was committed and the defendant committed it.

was entitled to refute that defense by use of appellant's pretrial alibi notice.

The State also suggests that its use of the alibi notice was proper because "Sims does not claim that he withdrew his alibi notice." We are not aware of any authority that requires a defendant who does not present a defense case to affirmatively withdraw an alibi notice in order to preclude the State from introducing it against him. Appellant posits that his defense attorney filed an alibi notice because it was "consistent" with a "prudent lawyer" who "simply wanted to make sure she had disclosed all potentially relevant witnesses." That is consistent with what appellant's counsel explained below; she told the judge that, when she entered the case, she felt "duty bound" to file the alibi notice. As appellant asserts:

> That a defendant lists a particular witness on an alibi notice reflects only a judgment by counsel that the witness *may* have information relevant to *some aspect* of a *possible* alibi defense. Inviting a lay jury to draw any conclusions from such a document, at least where the defendant does not present an alibi defense, invites only misdirection and confusion. (Emphasis in original).

In support of its contention that "[t]he trial court properly exercised its discretion in admitting the redacted alibi notice," the State points out that there is no statutory bar on admission of an alibi notice, and "the alibi-notice rule itself does not explicitly bar [its] admission." Moreover, according to the State, "The history of the alibi-notice rule reveals no intent to exclude such notices from evidence." In this regard, it relies on the minutes of a Rules Committee meeting in March 1975, which reflect a "discussion of subsection 728 e3 *ALIBI WITNESSES*...." The State posits: "A proposed Committee Note (that disclosures made under this rule were not intended to change the rules of evidence relating to admissibility) was considered, adopted, and then rejected." Because the Rules Committee "did not indicate explicitly that the alibi notice was not admissible," the State insists that "it would be inappropri-

ate to add such a provision in an appeal rather than a rulemaking proceeding."

In reply, appellant asserts:

It is unclear what impact the proposed Note might have had, and it is impossible to know why the Committee did not adopt it. Those minutes certainly display no intent to make Maryland the only state in which an alibi notice is admissible against a defendant who does not testify or call a witness. Even if the Committee meant to leave open whether an alibi notice can be used for impeachment, that would not support admission where defendant presents no case—a circumstance in which *every other state* to have considered admission has rejected it. (Emphasis in original.)

Based on our review of the minutes of the Rules Committee meeting in March 1975, we cannot say that the Rules Committee considered whether to permit the State to introduce an alibi notice as an admission of the defendant or to prove a false alibi in a case in which the defendant neither testified nor presented a defense case. It is not our province to expand the scope of the rule to include such a provision by implication, and we decline to do so.

*State v. Wiegmann,* 350 Md. 585, 714 A.2d 841 (1998), provides guidance. There, the Court concluded that the rule in issue in that case did not implicitly confer certain powers upon a domestic master, and said, id. at 593, 714 A.2d 841: " '[T]he construction of the rule urged by the State would engraft upon the rule a meaning not evident from the plain text. . . .' " Because the rule in issue did not provide express authority to the master to detain a litigant for contempt, pending judicial review of the master's recommendations, the Court declined to expand the rule to authorize such power by implication. *Id.* The same rationale applies here.

 In sum, in concluding that the court below erred, we are persuaded by the reasoning of the *Shannon* Court. Because we cannot improve upon it, we shall quote it, 276 N.W.2d at 548–49:

Informing the jury of defendant's failure to produce an alibi witness where he had previously given notice unduly denigrates defendant's case when he later chooses to present no evidence. At issue is the jury's ability to draw an impermissible inference of guilt from defendant's decision not to call an alibi witness and its relation to his involvement in the charged crime. A jury is left with the impression that by defendant's unsuccessful attempt to follow through with his alibi, guilt is rendered more presumable and apparent.

\* \* \*

It is axiomatic that defendant's failure to testify may not be commented upon by court or prosecutor. Defendant is under no duty is take the stand or proffer evidence, but rather may remain silent protected by the presumption of innocence. This continuing presumption of innocence serves as the basis for the requirement that the state has a never-shifting burden to prove guilt beyond a reasonable doubt. The lower court's instruction to the jury in effect restricted this presumption by allowing the jury to make adverse inferences from the alibi witness's failure to testify. If no adverse inference can be drawn from defendant's election, we see no reason to permit it in cases where he further elects not to better defend himself, here, through an alibi witness.

Further, there is no useful purpose served by informing the jury of defendant's original intention to produce an alibi and his subsequent decision not to call a supporting witness. The notice of alibi requirement was provided for the benefit and protection of the public. Its purpose is to enable the prosecution to investigate the merits of such a defense prior to trial, . . . and not to alert the jury of the defendant's proposed defense.

\* \* \*

. . . Where a defendant testifies to an alibi and calls no additional witnesses to support it, the prosecution, by commenting on the nonproduction of corroborating alibi wit-

nesses, is merely pointing out the weakness in defendant's case. When, however, the defendant produces no testimony to support an alibi, the prosecutor, by commenting on the nonproduction of alibi witnesses, is not exposing a weakness in defendant's case, but is rather improperly shifting the burden of proof to the defendant.

(Citations and footnotes omitted.)

## B.

The State claims that "any error in admitting the redacted alibi notice was harmless in light of other evidence admitted that showed that Sims tried to obtain false alibi testimony from his father and other evidence at trial." Moreover, it points out that it "did not mention the alibi notice in the opening statement" or in closing argument. Referring to the recorded telephone conversations, it contends that, "even without the alibi notice, the jury had evidence that [appellant] concocted a false alibi...." According to the State, "[t]hose tapes were much more powerful evidence than a sheet of paper listing a name and an address."

Furthermore, the State argues that "the other evidence at trial was strong." It cites the testimony of Brent and Montcreal Huggins, who testified that they saw Sims pull out a gun and heard gun shots; Sims's call to Montcreal after the shooting; the pretrial photo arrays, in which Brent and Montcreal Huggins identified Sims as the shooter; Montcreal's admission that she lied in her initial statement to police, when she claimed that she did not know who shot the victim; and "the taped phone calls ... reflecting a consciousness of guilt and an attempt to arrange false alibi testimony."

Appellant contends: "Given the power of the alibi notice to mislead the jury, its introduction was not harmless beyond a reasonable doubt." Characterizing the State's evidence against him as "very thin" and "weak," he argues that "[t]he case turned on eyewitness testimony regarding whether Mr. Sims was the man on the bike who shot Mr. Cornish," and the State's case was "refuted by 'the most credible' eyewitness,

resting instead on witnesses even the prosecution questioned and strained inferences from a single phone call."

Further, appellant contends:

The redacted notice of alibi, which (as admitted evidence) went to the jury room, took the form of a pleading, with the name of the trial court on the top, the caption listing the case title just below that, and the signature of Mr. Sims's counsel at the bottom. It was offered *only* to show that Mr. Sims had supposedly concocted a false alibi. The jury was completely unaware of the discovery purposes served by alibi notices, or the practices of prudent defense counsel, and was instead left with only the view that listing the senior Mr. Sims but not calling him exposed an attempted fraud on the court. Furthermore, introducing the alibi notice inevitably invited the jury to speculate as to why Mr. Sims did not call his father or put on a defense, thus "unduly denigrat[ing] [Mr. Sims's] case when he later [chose] to present no evidence.'" *See Shannon,* 276 N.W.2d at 548.

In *Bellamy v. State,* 403 Md. 308, 332, 941 A.2d 1107 (2008), the Court reiterated the scope of harmless error review:

In *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976), we adopted the test for harmless error announced by the Supreme Court in *Chapman v. State,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). As adopted in *Dorsey,* the harmless error rule is:

When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Dorsey,* 276 Md. at 659, 350 A.2d at 678.

*See also Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (citations omitted); *Owens v. State,* 161 Md.App. 91, 111, 867 A.2d 334 (2005).

■ To be sure, "[h]armless error review is the standard of review most favorable to the defendant short of an automatic reversal." *Bellamy,* 403 Md. at 333, 941 A.2d 1107. But, Maryland's appellate courts have upheld criminal convictions, notwithstanding error committed by the trial court, when the evidence of guilt was so "overwhelming" as to render the court's error harmless beyond a reasonable doubt. *See, e.g., Rubin v. State,* 325 Md. 552, 578, 602 A.2d 677 (1992); *Burral v. State,* 118 Md.App. 288, 298, 702 A.2d 781 (1997), *aff'd on other grounds,* 352 Md. 707, 724 A.2d 65 (1999), *cert. denied,* 528 U.S. 832, 120 S.Ct. 89, 145 L.Ed.2d 75 (1999).

■ We conclude that the error of the court in allowing the State to introduce the redacted alibi notice was not harmless beyond a reasonable doubt. We explain.

In the first instance, the strength of the State's case was not so overwhelming as to render the error inconsequential.[23] Thompson was standing within two feet of the shooter. Yet, he claimed at trial that appellant did not look like the shooter. The State also relied on the testimony of Montcreal and Brent Huggins. Although the jury was entitled to credit the portions of the witnesses' testimony favorable to the State, they also made statements that were favorable to appellant. In assessing their credibility, the jury could have been influenced by the admission of the alibi notice, which looked like an official court pleading, signed by appellant's own attorney. Although appellant had no burden to produce evidence, the jury could have drawn an impermissible inference of guilt based on appellant's failure to pursue a defense his own attorney had initially disclosed.

*State v. O'Neal,* 143 N.M. 437, 176 P.3d 1169 (App.2007), *cert. denied,* 143 N.M. 665, 180 P.3d 672 (2008), a harmless

---

**23.** We note that appellant was acquitted of first and second degree murder, and was convicted, instead, of manslaughter.

error/alibi case, stands in marked contrast to the case *sub judice.* In that case, the defendant was charged with multiple counts of "unlawful killing of deer" and related charges. *Id.* at 1170. Prior to trial, he submitted an alibi notice that "indicated that Defendant was with John Brazeal and another person at Mr. Hernandez's house while the alleged crimes were being committed." *Id.* at 1171. In voir dire, O'Neal's counsel indicated that he "expected to call Mr. Brazeal as a witness." *Id.* Then, during opening statement, the prosecutor said, without objection, *id.:*

> "Ladies and gentleman, the State has been put on notice that the defense in this case will be an alibi—I wasn't there. It wasn't me. I was not with them when these crimes were committed. And a John Brazeal and a Casey Nunley have been listed as potential witnesses to establish that it was not Patrick O'Neal who was involved in these cases. We'll see if they show up."

In the defense's opening statement, defense counsel did not refer to the alibi witnesses. But, "he asserted generally" that the defendant "was not present when the crimes took place." *Id.*

During the state's case-in-chief, the following exchange took place between the prosecutor and a witness who purportedly "knew Mr. Brazeal," *id.:*

> "[PROSECUTOR]: Mr. Fraser, in a document filed with this Court, [Defendant] has stated that he was present at Mr. Hernandez's ... house when you and Mr. Faulkner arrived with the deer in [Defendant's] pickup. Is that true?
>
> [WITNESS]: No.
>
> [PROSECUTOR]: [The notice of alibi] also states that [defendant] was not with you when you and Mr. Faulkner unlawfully shot and killed these deer. Instead, he was at [Mr. Hernandez's] house watching movies with John Brazeal.

[WITNESS]: That's also not true."

(Some alterations in original).

Defense counsel moved for a mistrial. *Id.* The prosecutor argued that "his reference to the notice of alibi did not prejudice Defendant because, even though Mr. Brazeal was not present to testify, the defense theory of the case continued to be that Defendant was not present during the commission of the crimes." *Id.* O'Neal's counsel countered that "the prosecutor's references to Mr. Brazeal essentially forced Defendant either to be silent or to call a witness that the defense might not wish to call, which amounted to prejudice." *Id.* The court denied O'Neal's motion for a mistrial, *id.*, and the prosecutor subsequently asked Mr. Hernandez a number of questions about Brazeal. *Id.* at 1172.

Thereafter, O'Neal elected to testify, and "the prosecutor elicited ... that he was with Mr. Brazeal at Mr. Hernandez's house on the day of the incident." *Id.* Defense counsel again moved, unsuccessfully, for a mistrial. *Id.*

On appeal, the court explained that, under Rule 5–802(E) of the New Mexico Rules Annotated, "[t]he fact that a notice of alibi was given or anything contained in such notice shall not be admissible as evidence in the trial of the case." *Id.* at 1173. The court concluded: "Given the clear language of Rule 5–508(E) ... the district court erred in allowing the State to introduce evidence regarding Defendant's notice of alibi." *Id.* Nevertheless, the court found that the error was harmless. *Id.*

The court rejected O'Neal's argument that the violation of Rule 5–508(E) forced him to testify, noting that O'Neal "never abandoned his alibi defense." *Id.* at 1174. It reasoned, *id.* at 1174–75:

From the beginning of the case, the theory of the defense was that Defendant was not with the man who admitted to killing and gutting the deer. Defense counsel stated his intention to call Mr. Brazeal, both in the notice of alibi and during voir dire, and never indicated that the defense would not be relying on an alibi theory. To the contrary, defense

counsel stated during his opening statement that Defendant was not present when the crimes took place and did not object to the prosecutor's opening statement that referenced the alibi defense and Mr. Brazeal.

\* \* \*

Defense counsel's argument does not square with the fact that the defense's theory of the case never switched from alibi to some other defense. In light of the fact that the defense did not provide any witnesses to corroborate the alibi theory, it seems that Defendant would have had to testify in order to get any affirmative evidence of his alibi in front of the jury. \* \* \*

\* \* \* In the present case, Defendant manifested a commitment to his alibi defense well before and well after the State improperly introduced the evidence regarding the notice of alibi.[ ] Given these circumstances, we conclude that there is not a reasonable possibility that the evidence regarding the notice of alibi contributed to Defendant's convictions.

Here, unlike in *O'Neal,* appellant never testified. Nor did appellant identify in voir dire any witnesses relevant to an alibi defense. Rather, in the defense requests for voir dire, appellant's attorney sought a question regarding "the jury's belief in self-defense." The court denied the request, stating "that's an element of the case. . . ." Moreover, while we have not been provided with the defense's opening statement, the State does not claim that appellant's trial attorney mentioned an alibi in opening statement. In closing, defense counsel pointed to appellant's statement to Detective Diaz, in which appellant said: " 'I wasn't there.' " However, defense counsel had a right to comment on the evidence introduced by the State.

Although the court did not propound an alibi instruction as it appears in Maryland Criminal Pattern Jury Instruction 5:00, it told the jury not to consider any references to potential alibi witnesses, "except as the testimony concerned the defendant's father and mother." As we see it, the court's attempt at a prophylactic instruction also served to highlight appel-

lant's failure to pursue his alibi defense by calling his parents to explain his whereabouts. It is beyond cavil that appellant had no burden to call any witnesses.

In our view, the error in admitting the redacted alibi notice was not harmless beyond a reasonable doubt.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL; COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**